# STRONGE AND LIGHTNER COMPANY v. COMMISSIONER OF TAXATION.[1]

April 1, 1949.

No. 34,803.

[1]Reported in 36 N. W. (2d) 800.

J. A. A. *Burnquist,* Attorney General, *David W. Lewis,* Assistant Attorney General, and *Charles P. Stone,* Assistant Attorney General, for relator.

E. F. *Hoeschen,* for respondent.

KNUTSON, JUSTICE.

Certiorari upon relation of the commissioner of taxation to review a decision of the board of tax appeals reversing the commissioner's determination of an additional tax due from respondent.

Minnesota imposes a corporate franchise tax on domestic and foreign corporations measured by the corporation's taxable net income for the taxable year for which the tax is imposed. M. S. A. 290.02. In the case of corporations carrying on a trade or business partly within and partly without the state the method of computing such income is prescribed by § 290.19.[2] Three principal formulas

[2] "Subdivision 1. *Computation when business conducted partly within state; apportionment.* The taxable net income from a trade or business carried on partly within and partly without this state shall be computed by deducting from the gross income of such business, wherever derived, deduction of the kind permitted by section 290.09 so far as connected with or allocable against the production or receipt of such income. The remaining net income shall be apportioned to Minnesota as follows:

"(1) If the business consists of the manufacture in Minnesota or within and without Minnesota of personal property and the sale of said property within and without the state, the remainder shall be apportioned to Minnesota on the basis of the percentage obtained by taking the arithmetical average of the following three percentages:

"(a) The percentage which the sales made within this state and through, from or by offices, agencies, branches or stores within this state is of the total sales wherever made;

"(b) The percentage which the total tangible property, real, personal, and mixed, owned or used by the taxpayer in this state in connection with such trade or business is of the total tangible property real, personal, or mixed, wherever located, owned, or used by the taxpayer in connection with such trade or business; and,

"(c) The percentage which the taxpayer's total pay-rolls paid or in-

are prescribed by the statute for determining the taxable income. The first of these, which is the exclusive method to be used in determining the taxable income of manufacturing companies, except upon petition of the taxpayer for the application of some other method under § 290.20, is arrived at by taking the arithmetical average of three percentages, namely, the percentage the sales made within the state bears to the sales everywhere; the percentage which the total tangible property, real, personal, and mixed, owned or used by the taxpayer in this state, bears to the total tangible property owned or used everywhere; and the percentage which the taxpayer's total payroll paid or incurred in this state bears to the payrolls paid or incurred within the entire business. This method will be hereinafter referred to as the three-factor formula. The second method provided by the statute, which is applicable to nonmanufacturing corporations, will be referred to hereinafter as the single-factor formula and is arrived at by taking the percentage which the total sales, gross earnings, or receipts from the business within this state bears to the total sales, gross earnings, or receipts from business operations everywhere. The third method mentioned in the

curred in this state or paid in respect to labor performed in this state in connection with such trade or business is of the taxpayer's total pay-rolls paid or incurred in connection with such entire trade or business;

"(d) The percentage of such remainder to be assigned to this state shall not be in excess of the sum of the following percentages: 70 per cent of the percentage determined under clause (1) (a), 15 per cent of the percentage determined under clause (1) (b), and 15 per cent of the percentage determined under clause (1) (c);

"(2) (a) In all other cases the proportion of such remainder to be assigned to this state shall be that which the sales, gross earnings, or receipts from business operations, in whole or in part, within this state bear to the total sales, gross earnings, or receipts from business operations wherever conducted;

"(b) If the methods prescribed under clause (2) (a) will not properly reflect taxable net income assignable to the state, there shall be used, if practicable and if such use will properly and fairly reflect such income, the arithmetical average of the three percentages set forth in clauses (1) (a), (1) (b), and (1) (c), of this section or the separate or segregated accounting method;"

statute will be hereinafter referred to as the separate or segregated accounting method and consists of taking the actual net earnings of each unit of the business conducted within the state and using that as a basis for determining the taxable income assignable to Minnesota.

For a full understanding of the questions involved, a rather detailed statement of facts is required. Taxpayer is a domestic corporation organized and commencing its business in 1936. Its home office is in St. Paul, Minnesota. It owns and operates a chain of 48 retail stores engaged exclusively in selling women's hats, gloves, and purses. It operates its stores under the tradenames of "Dotty Dunn" and "Lady Fair." Merchandise is sold by all stores at uniform prices fixed by the home office. During the year in question (the one ending January 31, 1943), 22 of its stores were located within Minnesota, and the remainder were scattered throughout Wisconsin, Iowa, North Dakota, South Dakota, Colorado, Utah, Montana, Oregon, and Washington. The stores are operated on a strictly cash basis, and all receipts are deposited in local banks, subject to check by the main office only. Taxpayer owns no real estate anywhere. Its stores are located in rented premises. Each store is operated under the direct supervision of a local manager, who hires the sales personnel in that store. These people live in the community where the store is located. The manager is generally hired by an officer of the company when the store is opened or when a change is made. Each store manager keeps a complete inventory record of merchandise on hand and of the sales made by the store each day. She makes weekly reports of her inventory and daily reports of sales to the home office in St. Paul. She is charged with the responsibility of cash receipts, which she deposits in the local bank in the town where the store is located. She keeps the time sheets of the sales personnel in the store. These time sheets are forwarded weekly to the company's home office in St. Paul. Payroll checks are drawn by the bookkeeper at the home office on each store's account in the local bank in the town where the store is located. With the exception of direct expenses of a local store, which are paid out

of the store's petty cash funds, the store's expenses are likewise paid by check issued at the home office in St. Paul and drawn upon the store's account in the local bank where the store is located.

About 90 percent of the goods handled by taxpayer is purchased in eastern markets, largely in New York and Chicago. Taxpayer employs one buyer, who, together with the two principal officers of the company, buys all the merchandise. After the merchandise is purchased, it is price-ticketed at the factory with taxpayer's price tickets and then shipped to the home office in St. Paul. The home office, in addition to the office space, consists of a store and a warehouse occupying two floors of a building covering a space of about 45 x 120 feet. At the home office, the merchandise is sorted by taking it out of the original packing cases and placing one or more hats of each style destined for each store in packing cases, and then it is shipped in such quantities as each store can handle, depending upon the volume of its business.

Merchandise is purchased on as nearly a current basis as possible. Most purchases are made within ten days of delivery time. A supply of about two and one-half weeks is kept in the stores and an additional week's supply at the home office. Merchandise arrives at the home office almost every day, and it is sorted and shipped to the individual stores on the same day or within a few days of its arrival.

There are employed at the home office one stenographer, three boys who unpack merchandise and repack it for shipment to the company's stores, and three additional girls, who sort hats, gloves, and purses for the company's individual stores. Altogether, there are 11 employes at taxpayer's home office, in addition to the buyer and taxpayer's two officers.

The two officers of taxpayer make frequent trips to New York, Chicago, and other points where goods are purchased, and they also make trips to the company's stores located in the various states for the purpose of checking up on their operations, discussing problems with the managers of the respective stores, and generally supervising the whole operation. They also make trips to various

localities for the purpose of establishing new stores, which involves inspecting locations, interviewing prospective managers, and matters of that kind. Taxpayer employs no salesmen and makes no effort to do any wholesale selling. It does a small amount of wholesale business, largely for the accommodation of stores which desire to purchase goods handled by the taxpayer. Less than two percent of its gross volume consists of wholesale business, and that is not involved in the problem here, for the reason that taxpayer has credited to Minnesota all earnings from wholesale business done everywhere.

Taxpayer's return for the fiscal year ending January 31, 1943, showed that gross sales everywhere amounted to $738,718.43. Gross sales in Minnesota, including all wholesale business, amounted to $276,087.15, or, based on the single-factor formula, would amount to 37.3738 percent of the gross sales everywhere. Taxpayer's total apportionable net income for the year involved amounted to $50,-408.17. Applying the single-factor formula, under which 37.3738 percent of taxpayer's total net income would be assignable to Minnesota, taxpayer arrived at the taxable income of $18,839.55 assignable to Minnesota. To this sum taxpayer added $58.61, representing the gain on sale of capital assets allocable to Minnesota, arriving at a total Minnesota net income of $18,898.16. From this amount, taxpayer deducted $3,946 on account of federal income taxes and arrived at the Minnesota taxable net income of $14,952.16. Some corrections in this return have been conceded, so taxpayer concedes that the correct amount should be $14,973.83.

From its inception in 1936, the single-factor formula has been applied to taxpayer's income in determining the amount allocable to Minnesota. For the year 1943, the commissioner determined that the single-factor formula does not properly reflect the income earned by activities of the home office of the company and that the three-factor formula should be used instead. By applying the three-factor formula, the commissioner determined that Minnesota was entitled to 46.588 percent of taxpayer's net income, and that this percentage, applied to the apportionable income of $50,408.17, re-

sulted in assigning to Minnesota a taxable income of $23,484.16, and consequently an additional tax of $268.05. Taxpayer keeps a separate set of books for each individual store and computes the net earnings of each store individually. By applying the separate accounting method, Minnesota would be entitled to 25.054 percent of taxpayer's net income, which, applied to the total net income allocable, would produce for Minnesota a taxable income of $12,-629.19 before deduction of federal income tax and Minnesota contributions. By using the single-factor formula, the net income assignable to Minnesota would exceed by the sum of $6,210.36 the actual earnings of the retail stores operated here. By using the three-factor formula, the net income assignable to Minnesota would exceed by $10,854.97 the total net earnings of the stores in Minnesota.

An appeal was taken from the decision of the commissioner to the board of tax appeals. The board of tax appeals determined that the application of the single-factor formula fairly reflected the taxable income assignable to Minnesota. It reversed the decision of the commissioner and held that the single-factor formula should be used in determining taxpayer's taxable income, and consequently the tax as determined by taxpayer in its return was held to be correct. To review the decision of the board of tax appeals, the case comes here on certiorari.

■ Our review of a decision of the board of tax appeals is necessarily limited by the provisions of M. S. A. 271.10. In Duluth-Superior Dredging Co. v. Commr. of Taxation, 217 Minn. 346, 14 N. W. (2d) 439, we held in effect that the limitations imposed upon our review is similar to that imposed upon the circuit court of appeals in reviewing decisions of the United States board of tax appeals or the later tax court, citing and following Dobson v. Commr. of Int. Rev. 320 U. S. 489, 64 S. Ct. 239, 88 L. ed. 248. Following the Duluth-Superior Dredging Co. case, we said in Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 532, 14 N. W. (2d) 923, 925:

"All questions of law and fact are to be viewed by us in the light of the rule that a decision of the board of tax appeals will not be disturbed if it has any reasonable basis in law."

It is probably true that in the reorganization of our tax department in 1939 our legislature had in mind substantially the same objects in setting up an independent agency as a branch of the executive department of our government as congress had in setting up the federal board of tax appeals.[3] Village of Aurora v. Commr. of Taxation, 217 Minn. 64, 14 N. W. (2d) 292. In Warren Mfg. Co. v. Tait (D. C.) 60 F. (2d) 982, 984, the federal court said respecting the objects of establishing the board of tax appeals:

"The history of, and the primary objects sought to be obtained by the creation of, the Board of Tax Appeals must be understood. The Board was created in 1924. One of its principal objects was to relieve the taxpayer of the hardship of paying a deficiency assessment before contesting the same, which was necessary prior to

[3] 1 House Reports, 69th Cong., 1st Sess., p. 19:

*Court review—Questions of fact and law.*—The procedure is made to conform as nearly as may be to the procedure in the case of an original action in a Federal district court. Inasmuch as the complicated and technical facts governing tax liability require a determination by a body of experts, the review is taken directly to an appellate court, just as, for instance, in the case of orders of the Federal Trade Commission, and orders of the Secretary of Agriculture under the packers and stockyards act. In view of the grant of exclusive power to the board finally to determine the facts upon which tax liability is based, subdivision (b) of section 914 limits the review on appeal to what are commonly known as questions of law. The court upon review may consider, for example, questions as to the constitutionality of the substantive law applied, the constitutionality of the procedure used, failure to observe the procedure required by law, the proper interpretation and application of the statute or any regulation having the force of law, the existence of at least some evidence to support the findings of fact, and the validity of any ruling upon the admissibility of evidence (see subdivision (a) of section 907 and subdivision (b) of section 914) [§ 1003 (b) of the Code, 26 USCA, Revenue Act of 1926]. The court, therefore, may adequately control the action of the administrative officer or agency, but will not be burdened with the duty of substituting its opinion for that of the board upon the evidence."

that time. But also it was intended to relieve the federal courts of the great burden of tax litigation to which they exclusively fell heir, by transferring it to a new agency, which, by its specialized work, would be an expert body better fitted than a court of general jurisdiction to hear and decide tax questions."

The federal board of tax appeals was first created in 1924. Revenue Act of 1924, 26 USCA, § 900, p. 110. In the first act, congress provided only that the findings of the board shall be prima facie evidence of the facts therein stated. Revenue Act of 1924, 26 USCA, § 900(g). Two years later, congress provided for a direct appeal to the circuit court of appeals or the court of appeals of the District of Columbia (Revenue Act of 1926, 26 USCA, § 1001, p. 311), and attached to the decisions of the board of tax appeals a finality greatly limiting the right of review. Section 1003(b), which reads:

"Upon such review, such courts [circuit court of appeals or court of appeals of District of Columbia] shall have power to affirm or, if the decision of the Board is not in accordance with law, to modify or to reverse the decision of the Board, with or without remanding the case for a rehearing, as justice may require."
This provision was applied by the several appellate courts having jurisdiction of such appeals, with varying results, and ultimately led to the decision of Dobson v. Commr. of Int. Rev., *supra.* In that case the United States Supreme Court said (320 U. S. 498, 501, 64 S. Ct. 245, 246, 88 L. ed. 254, 256):

"* * * It [the tax court] deals with a subject that. is highly specialized and so complex as to be the despair of judges. It is relatively better staffed for its task than is the judiciary. Its members not infrequently bring to their task long legislative or administrative experience in their subject. * * * Tested by every theoretical and practical reason for administrative finality, no administrative decisions are entitled to higher credit in the courts. Consideration of uniform and expeditious tax administrations re-

quire that they be given all credit to which they are entitled under the law.

\* \* \* \* \*

"\* \* \* all that we have said of the finality of administrative determination in other fields is applicable to determinations of the Tax Court. Its decision, of course, must have 'warrant in the record' and a reasonable basis in the law. But 'the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' "

In John Kelley Co. v. Commr. of Int. Rev. 326 U. S. 521, 527, 66 S. Ct. 299, 302, 90 L. ed. 278, 282, the United States Supreme Court, following the Dobson case, said:

"It is only recently that we gave careful consideration to the problems of review of Tax Court decisions. Dobson v. Commissioner, 320 U. S. 489, 64 S. Ct. 239, 88 L. ed. 248. That opinion emphasized that our interpretation of Congressional purpose, in enacting the statute, just quoted, for judicial review of Tax Court decisions, was that Congress intended to leave to the final determination of the Tax Court all issues which were not clear-cut questions of law."

The Dobson case was thereafter cited and followed so often that it became known in the field of tax law as the Dobson rule, attaching to decisions of the federal board of tax appeals and to its successor, the tax court, complete finality except on "clear-cut questions of law." The decision was severely criticized by students of tax law, and courts had difficulty in applying it. Numerous articles were written pointing out the inadvisability of attaching such finality to the decisions of an administrative board.[4] Congress

---

[4]William T. Plumb, Jr., *The Tax Benefit Rule Tomorrow*, 57 Harv. L. Rev. 675, where the author said regarding the Dobson rule, "In the field of tax administration, the case is a landmark, but as a tax benefit decision it is a disappointment. Instead of clarifying the witches' brew, it has stirred up new troubles from its depths." Randolph E. Paul, *Dobson v. Commissioner: The Strange Ways of Law and Fact*, 57 Harv. L. Rev. 753; Erwin

finally took a hand in the matter and abandoned the Dobson rule by act of congress. In 1948, 26 USCA, § 1141(a), Int. Rev. Code, was amended to read:

"The circuit court of appeals and the United States Court of Appeals for the District of Columbia shall have exclusive jurisdiction to review the decisions of the Tax Court, except as provided in section 1254 of title 28 of the United States Code, in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury; and the judgment of any such court shall be final, except that it shall be subject to review by the Supreme Court of the United States upon certiorari, in the manner provided in section 1254 of title 28 of the United States Code."

In Wright-Bernet, Inc. v. Comm. of Int. Rev. (6 Cir.) 172 F. (2d) 343, 345, the court said respecting the new rule established by the above amendment (Federal Tax Report Bulletin, p. 72,333):

"Under this amendment, in reviewing decisions of the Tax Court, we not only are to decide questions of law, but are to consider the findings of fact."

See, also, MacManus v. Commr. of Int. Rev. (6 Cir.) 172 F. (2d) 697; Commr. of Int. Rev. v. Estate of Cardeza (3 Cir.) Nos. 9207, 9208, decided February 8, 1949; Grace Bros. Inc. v. Commr. of Int. Rev. (9 Cir.) No. 11,976, decided February 18, 1949; Warren F. Wattles, *Federal Tax Cases Upon Appeal: The Rise and Demise of the Dobson Rule,* 1 U. of Fla. L. Rev. 1948, pp. 333, 342.

While we followed the Dobson rule in Village of Aurora v. Commr. of Taxation, 217 Minn. 64, 14 N. W. (2d) 292, and later in Duluth-Superior Dredging Co. v. Commr. of Taxation, 217 Minn.

N. Griswold, *The Need for a Court of Tax Appeals,* 57 Harv. L. Rev. 1153, 1170, where the author says: "No one understands its scope, and there is almost certain to be more litigation as to the applicability of the Dobson rule than there was as to the basic tax questions themselves"; Robert L. Stern, *Review of Findings of Administrators, Judges and Juries: A Comparative Analysis,* 58 Harv. L. Rev. 70; George T. Altman, *The Dobson Rule,* 21 Tulane L. Rev. 527.

346, 14 N. W. (2d) 439, and Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 14 N. W. (2d) 923, *supra,* it is doubtful whether our review of a decision of the state board of tax appeals was ever so limited by our statute as it was under the federal rule, and particularly under the Dobson case. Our statute (§ 271.10) reads in part:

"A review of any final order of the board of tax appeals may be had upon certiorari by the supreme court upon petition of any party to the proceedings before the board. Such review may be had on the ground that the board was without jurisdiction, *that the order of the board was not justified by the evidence* or was not in conformity with law, or that the board committed *any other error of law.*" (Italics supplied.)

That the Minnesota statute did not limit review as narrowly as was done by the Dobson case seems evident from an examination of our statute. The words "justified by the evidence" in our statute are not synonymous with "warrant in the record," nor consistent with the statement that (320 U. S. 501, 64 S. Ct. 246, 88 L. ed. 256) "the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body," the rule established by the Dobson case. If our statute is not a declaration of the law as it existed prior to the establishment of the board of tax appeals, it is at least as broad as that rule. In State ex rel. Inter-State Iron Co. v. Armson, 166 Minn. 230, 232, 207 N. W. 727, 728, which involved certiorari to review the action of the old Minnesota tax commission, we said with respect to the scope of such decision:

"* * * It is well settled that in reviewing an order or determination of an administrative board, this court will go no further than to determine: (1) Whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of the law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence

was such that it might reasonably make the order or determination in question."

The above statement copies verbatim the general rule stated in 1 Dunnell, Dig. § 397b, applied to an appeal from any administrative order. See, also, State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759; Chellson v. State Div. of Employment & Security, 214 Minn. 332, 8 N. W. (2d) 42. For a collection of the cases, see 1 Dunnell, Dig. § 397b.

The commissioner contends that upon an appeal to the board of tax appeals the taxpayer is faced with the presumption that the decision of the commissioner is valid in view of M. S. A. 271.06, which, after providing that the board shall consider and determine every appeal *de novo* upon the issues made by the notice and return, states "that the order of the commissioner in every case shall be prima facie valid." While it may be true that, if the taxpayer offered no further evidence than the return, the decision of the commissioner would control, it does not follow that when the taxpayer does offer evidence, as it did here, the board is controlled by the decision of the commissioner. This conclusion is fortified by the language of the statute itself. After providing that the order of the commissioner shall be prima facie valid, it says:

"* * * In case *no appellant shall appear* the board shall enter its order affirming the order of the commissioner of taxation from which the appeal was taken." (Italics supplied.)

The inference is clear that if the appellant does appear and offer evidence the board of tax appeals shall try the matter *de novo* and make its own decision, based on the evidence before it. Section 271.07 requires that a stenographic report of all proceedings before the board be made. Section 271.08 requires the board to make findings of fact. Section 271.11 reads:

"In all cases determinable by order of the commissioner of taxation, the order of the commissioner, *or in case of appeal therefrom, the order of the board of tax appeals* or the decision of the

supreme court, as the case may be, shall be prima facie evidence of all facts therein stated and shall be prima facie evidence that all precedent requirements of the law were complied with, and shall be prima facie valid, and such order or decision shall be conclusive as to all matters therein determined upon every appellant or petitioner for review and upon all parties to the proceedings who shall have so agreed, in writing, as herein provided." (Italics supplied.)

Chellson v. State Div. of Employment & Security, 214 Minn. 332, 8 N. W. (2d) 42, *supra,* involved an appeal from an order of the director of the division of employment and security. After a decision by the appeal tribunal, claimant appealed to the director, who modified the decision, and an appeal was thereafter perfected to this court. The question arose as to whether the decision of the appeal tribunal or that of the director should be considered in determining whether there was reasonable evidence to support the finding. We held that we would consider the decision of the director, stating (214 Minn. 335, 8 N. W. [2d] 44) "that the test on this appeal is whether there is reasonable support in the evidence to sustain the decision of the director rather than the decision of the appeal tribunal."

■ A trial *de novo* means that a case shall be tried the same as if it had not been tried before, and a court or tribunal conducting such trial may substitute its own findings and judgment for those of the inferior tribunal. California Co. v. State Oil & Gas Board, 200 Miss. 824, 838, 27 So. (2d) 542, 545, 28 So. (2d) 120; Bley v. Luebeck, 377 Ill. 50, 35 N. E. (2d) 334; Deshler Broom Factory v. Kinney, 140 Neb. 889, 2 N. W. (2d) 332; 42 Wd. & Phr. (Perm. ed.) p. 524; Black, Law Dictionary (3 ed.) 1756.

Upon a trial *de novo*, a taxpayer may introduce evidence. The decision of the board of tax appeals may or may not be based upon the same evidence as the commissioner had. The taxpayer has the burden of proving that the primary or specific method prescribed by the statute for determining the income assignable to Minnesota

properly reflects income assignable to Minnesota, but he should not be expected to shoulder the additional burden of showing that the alternative methods do not fairly reflect income assignable to Minnesota. The hearing before the board of tax appeals is a trial *de novo,* not simply a review.

■ Tested by these rules, the determinative question in the matter now before us is this: Is the decision of the board of tax appeals justified by the evidence?

The question of how income from a unitary business operated partly within and partly without the borders of the tax state should be allocated has been a source of much confusion and involves many practical difficulties readily foreseeable when applied to factual situations that differ in practically every case.[5] Obviously, no single formula can hope to apply equally as well to every case.[6]

In Minnesota, our legislature has attempted to differentiate between manufacturing and nonmanufacturing concerns. As to manufacturing concerns, the three-factor formula is mandatory so far as the taxing authorities are concerned. The taxpayer may petition to have some other basis applied if he feels aggrieved by the application of the three-factor formula. § 290.20. But the statute gives the commissioner no discretion in applying any other formula to manufacturing concerns.

When we come to a nonmanufacturing business, the legislature, by § 290.19, subd. 1(2)(a), has first prescribed the single-factor formula. If the statute had gone no further than this paragraph, it also would be mandatory. However, the legislature thereafter added paragraph (2)(b), which provides that if paragraph (2)(a) does not properly reflect taxable net income assignable to the state there shall be used, if practicable and if such use will properly and

---

[5]William W. Watson, *Allocation of Business Income for State Income Tax Purposes,* 25 Minn. L. Rev. 851; Annotation, 167 A. L. R. 981.

[6]Henry Rottschaefer, *The Minnesota State Income Tax,* 18 Minn. L. Rev. 93, 158. For a collection of the apportionment statutes of the various states, see Tax Law Review, January 1949, p. 222, *et seq.*

fairly reflect such income, the three-factor formula or the separate or segregated accounting method.

The board of tax appeals contends that subd. 1(2)(a) provides the specific formula which is to be applied in cases of nonmanufacturing types of business in preference to the alternative method set forth in paragraph (2)(b). With this we agree. The legislature, in setting forth in paragraph (2)(a) a specific method and thereafter providing alternative methods to be used in those exceptional cases where the single-factor formula would not properly reflect the taxable net income assignable to Minnesota, must have had in mind that the specific method was fair and should be used in all except those exceptional cases where it could not be used. If this were not so, there would have been no object in separating the single-factor formula and the alternative methods in two separate paragraphs.

The test is not which method will produce the greatest revenue for the state of Minnesota. The specific formula set forth in subd. 1(2)(a) must be used, except in those cases where it does not properly reflect the taxable income assignable to Minnesota. The legislature obviously intended to provide some elasticity so that the commissioner could use the three-factor formula or the separate or segregated formula in those exceptional cases where the single-factor formula would not be proper.

It is interesting to note that in the original statute providing for an income or franchise tax, based on income, manufacturing and nonmanufacturing businesses were treated alike. The tax was based on the percentage which the sales made within the state, or through, from, or by offices, agencies, branches, or stores within the state, bear to total sales everywhere. L. 1933, c. 405, § 25. The commission was given authority to require the taxpayer to use other methods if the prescribed methods did not properly reflect taxable income assignable to him. The taxpayer could also petition the commission for authority to use some other method if he felt aggrieved. *Id.* § 26.

Our present statute came into existence by L. 1939, c. 446, § 22, *et seq.*, and has remained substantially the same since. In this amendment, manufacturing and nonmanufacturing concerns were placed on a different basis. As to manufacturing companies, the discretion of the commission to apply any other method than that prescribed by paragraph (A)(1) was eliminated. The taxpayer's right to petition for use of other methods was preserved. L. 1939, c. 446, § 23. A separate paragraph, (A)(2), was included, covering a business consisting of the manufacture, wholly without the state of Minnesota, of personal property and the sale of such property within and without the state. As to such concerns, the percentage of sales within the state to total sales was to be used. Here, also, the commissioner had no discretion but to apply this method. As to nonmanufacturing concerns, the legislature must have felt that more flexibility was required. Consequently, after prescribing the primary or specific method to be used in L. 1939, c. 446, § 22(A)(3)(a), which provided a yardstick, namely, the percentage that sales, gross earnings, or receipts from business operations *within the state* bear to total sales, gross earnings, or receipts from business operations *wherever conducted,* the legislature, no doubt having in mind the many variations in the types of business and methods of operation that might come within this category, added another paragraph, (A)(3)(b), providing that if the method prescribed by (A)(3)(a) does not properly reflect taxable income assignable to this state there shall be used, if practicable and if such use will properly and fairly reflect such income, the three-factor formula prescribed for manufacturing concerns or the separate or segregated accounting method.

In the amendment of the law by L. 1941, c. 550, § 20, paragraph (A)(2) of the 1939 act was eliminated, but otherwise the law has remained the same and is now M. S. A. 290.19.

The dispute in this case arises over the application of the methods prescribed by § 290.19, subd. 1(2)(a) or (2)(b), to the facts presented. If by using the method prescribed by (2)(a) the taxable income assignable to Minnesota is properly reflected, it was the

duty of the commissioner in the first instance, and the board of tax appeals upon an appeal from the commissioner's determination, to apply that method. Substantially the only question of any serious consequence is whether the order and decision of the board of tax appeals is justified by the evidence. That it is in conformity with the law, if it is justified by the evidence, cannot well be questioned, in view of the fact that the primary or specific method prescribed by the legislature has been used.

The main contention of the commissioner is that the single-factor formula does not properly reflect the income-producing activities of the home office of taxpayer. It is obvious that by using the single-factor formula instead of the separate or segregated accounting method, which all parties agree is inapplicable here, income in the sum of $6,210.36 is assigned to Minnesota in excess of all net earnings of the stores in Minnesota. Manifestly, it is impossible to determine with any degree of mathematical certainty how much income the activities of the home office produce or help to produce in the stores located outside the state of Minnesota. A great deal of the time of the two officers is spent outside the state. One of these factors in the three-factor formula is payroll. In a total payroll in Minnesota of $72,948.55, about one-third, or $24,-661.98, is paid to the two officers. By varying the salaries of the two officers, the percentage could likewise be changed. And, similarly, other items of payroll may fluctuate from time to time, depending on the number of employes and the rate of pay used to compensate them for the work done in the home office, but there is no way of determining, and the commissioner has not indicated any method that could be used for determining, how much the activities of the home office would earn in operating stores outside the state.

In setting up a separate accounting system, each store is charged with its approximate share of the home office expense. If this system were used to determine taxable income assignable to Minnesota, this state would receive $6,210.36 less taxable income than it does under the formula used. The board of tax appeals has de-

termined that this amount properly reflects the income-producing activities of the home office.

Obviously, it is impossible to lay down any definite rule that will apply to all cases. The facts in each case must determine, within the limits of fair human judgment, which formula should be applied. A good example of a case in which the single-factor formula could not be applied is Allied Building Credits, Inc. v. Commr. of Taxation, Board of Tax Appeals Docket No. 253, decided by the board on October 29, 1947. In that case, a Delaware corporation, authorized to do business in Minnesota, had established its home office in the state. It operated a loan and investment business in 36 states. Very little of its income was actually earned in Minnesota. Obviously, the home office activities had some substantial income-producing results. The commissioner applied the three-factor formula and was sustained by the board of tax appeals. The case presented an exceptional rather than a usual case.

The commissioner assigns as error the admission of evidence showing net earnings of the individual stores operated in Minnesota based on a separate accounting system. There was no error in admitting such exhibits. In determining whether the amount assignable to Minnesota, by using the single-factor method described above, reflected any income from the activities of the home office, it was proper to determine how much more income was assigned to Minnesota than was actually earned here. Such excess represented largely income from activities of the home office. In comparing the two, it was necessary to know what the actual net income from the stores in Minnesota amounts to, and the only way of ascertaining this was by reference to the separate accounts of each individual store.

■ It seems to us that the case now before us is the usual case of a unitary business having its home office here and conducting its retail sales business partly within and partly without the borders of our state. Of the retail stores, almost half are located in Minnesota. The amount assigned to Minnesota for activities of the home office is almost half as much as the entire net earnings of

the 22 stores located here. The legislature must have had in mind the usual business of this kind when it prescribed the single-factor formula as the primary or specific method to be used in determining taxable income assignable to Minnesota. Under the circumstances, we believe that the board's determination that the single-factor formula properly reflects the net income of respondent assignable to Minnesota is justified by the evidence and must be affirmed.

Affirmed.

