# SKELLY OIL COMPANY v. COMMISSIONER OF TAXATION.

131 N. W. (2d) 632.

September 25, 1964—Nos. 39,164, 39,214.

*Hayner N. Larson, Loring M. Staples,* and *Faegre & Benson,* for the taxpayer.

*Walter F. Mondale,* Attorney General, and *Jerome J. Sicora,* Assistant Attorney General, for the commissioner.

NELSON, JUSTICE.

Certiorari upon the relation of the commissioner of taxation and Skelly Oil Company, hereinafter referred to as Skelly, to review an order of the Board of Tax Appeals. Skelly contends that said order was in error and not in conformity with law in the following respects: (1) In including in its income apportionable to and subject to tax in Minnesota, a portion of its production income for the years 1951 to 1955; (2) in failing to make provision for deduction of the full amount of Federal income taxes paid by it on the class of income assignable to Minnesota.

Skelly is a Delaware corporation with its principal offices in Tulsa, Oklahoma. It is qualified to transact business in this state and files tax returns here as required by Minn. St. c. 290. Its Minnesota corporate income and franchise tax returns are completed according to the accrual method of accounting, that being the method employed in keeping the taxpayer's books.

The company is engaged principally in the production and sale of crude oil and natural gas, both of which are carried on wholly outside Minnesota, and in the refining of crude oil and the marketing of the resulting refined products and of related accessories, appliances, and products such as tires, batteries, and liquid petroleum gas. Its activities in this state related only to such refining and marketing, which are carried on partly within and partly without this state. This was true during the years 1951 to 1955.

Skelly is organized internally on a departmental basis with operating departments and service or administrative departments. The operating departments are known as Lands and Leases, Geology and Geophysics, Oil and Gas Production, Manufacturing, and Marketing—each under a vice president—and also a Pipeline Department which is connected with the Manufacturing Department and is supervised by a manager. The first three departments are concerned only with the company's production activities. The latter three are concerned only with refining and marketing.

There are four administrative departments—Accounting, Purchasing, Law, and Secretary-Treasurer. These departments provide services to the several operating departments and also to Skelly's president and executive vice president and their assistants.

Skelly has carried on the manufacture of refined petroleum products during the times herein mentioned at three widely separated refineries—one at El Dorado, Kansas, a second at Longview, Texas, and the third at Denver, Colorado. The first two refineries have each been served by pipelines owned and operated by the taxpayer for the transportation of crude oil from adjacent production areas. Skelly also has a pipeline in Velma, in southern Oklahoma, but this line has no connection with any Skelly refinery. It is actually a field-gathering system connected with production rather than a pipeline for purposes of transportation and is so far from any Skelly refinery that transportation costs would make it uneconomical to use it for transportation of oil to the company's refineries. The Kansas pipeline is substantially larger than the other two and services about 4,000 wells as against 400 by the Velma line and 75 by the Longview line. (The latter was sold subsequent to the years here in issue.)

When decisions are made as to where, when, and in what volume Skelly's production of crude oil and natural gas shall be carried on, they are made without participation by the Manufacturing or Marketing Departments and without regard to whether Skelly has refineries, or to the needs of such refineries, although they are subject to the control exercised by state regulatory authorities. Such decisions lie wholly within the hands of the three departments having to do with

production, namely, Lands and Leases, Geology and Geophysics, and Oil and Gas Production. The job of the Department of Geology and Geophysics is to search and explore for likely producing areas and to make recommendations when evidence favors their acquisition. These recommendations go to Lands and Leases, which secures the necessary drilling and production rights, usually through leases but occasionally by the purchase of fee title, and makes other necessary arrangements including agreements with other producers which will facilitate drilling and exploration.

The Departments of Geology and Geophysics and Lands and Leases make the decision with respect to the drilling of the first well on acquired acreage, the Department of Oil and Gas Production participating only in decisions with respect to the drilling of additional wells on the same acreage. The Manufacturing and Marketing Departments are not consulted in the making of production decisions even though there may be a Skelly refinery nearby. Lands and Leases and Geology and Geophysics work closely together and share joint offices at strategic points from Bismarck, North Dakota, to Shreveport, Louisiana. The record is clear that no such office has ever been maintained in Minnesota and that Skelly has never done any geological work in Minnesota nor had any oil or gas leases, refinery, wells, or pipelines in the state, its activities here being limited to marketing.

The operation of the producing wells is the sole responsibility of the Oil and Gas Production Department. The gas produced is sold in its natural state at the well to connecting transmission companies. If there is any condensate drawn off at the gas wells, this is also sold to third parties at the point of production and customarily removed by tank trucks.

Oil obtained from the wells is run directly into one or more storage tanks which the production department maintains on the producing leasehold, the number of tanks varying with the number and productivity of the wells and the size of the property. With two exceptions, the oil is then sold to outside pipeline companies operating in the area, with delivery to the pipeline at the tanks if direct connection

has been made, or, if not, by trucking to a point of delivery elsewhere. The exceptions noted are that about 60 percent of the taxpayer's production in Kansas is transported to its refinery at El Dorado for manufacture there, and about 10 percent of its east Texas production to its refinery at Longview for like purpose.

Skelly's production in the vicinity of Velma, Oklahoma, is sold to outside interests, delivery to the purchaser being made at a central storage point to which Skelly moves the oil through its Velma gathering system. Skelly also buys the oil of other producers in this area and moves it together with its own production to the storage point, where it is all sold to buyers who transport it through connecting pipelines to refineries in the area. The cost of transportation to Skelly's refineries would be prohibitive.

All sales of Skelly crude production to third parties are made at what is called the "posted field price" or, if the sale is made at a point elsewhere than at the producing premises, that price plus cost of transportation to such point. The posted field price is the announced price being paid currently by purchasers of the crude oil at the wellhead in a specific area for crude petroleum of the kind and quality there available. All large buyers "post" such prices, and they do so by circulation of printed bulletins. During the years here involved Skelly posted field prices in areas where it was a buyer of crude oil, namely, Kansas, where the El Dorado refinery is situated; southern Oklahoma, where purchased oil is carried along with Skelly production in the Velma gathering system; and in eastern Texas, where crude oil was then being purchased for the Longview refinery.

Posted field prices control the amounts at which crude oil passes from hand to hand in the fields to which they relate. They are bona fide competitive prices, not subject to manipulation or rigging, for the reason, aside from others, that their maintenance is effectively policed by state regulatory bodies and also by state and Federal taxing authorities in connection with enforcement of taxing statutes.

The posted field prices control not only what Skelly pays for production bought from others, but also what it gets for its own production sold to others. This is the case with respect both to the pur-

chase of crude oil for its own refineries and the purchase of crude oil which it later resells to others. For example, in the Velma area neither Skelly's own production nor the crude oil purchased from other producers goes to the taxpayer's own refineries. The sales to others are at the posted field price plus transportation costs.

The production of crude oil in Kansas and in eastern Texas going to the El Dorado and Longview refineries was transferred or "sold" by the Oil and Gas Production Department to the Manufacturing Department precisely as is done when the sale is made to outside parties. The production department was credited with the sale and the Manufacturing Department charged with the purchase in this amount. About 15 percent of the taxpayer's purchase of crude oil is made under what are called buy-and-sell agreements, usually with other refineries, whereby each party agrees to sell to the other a specified quantity of oil from a particular area at the posted field price in effect on the date of delivery, plus a flat additional amount to cover transportation costs if delivery is elsewhere than at the place of production. Such arrangements are not of advantage to production operations or the production departments, but only to the Manufacturing and Marketing Departments. An occasional objective is the earning of a transportation profit which is included in the earnings of Manufacturing and Marketing Departments but never in the earnings or the profits of the production departments. The agreements are advantageous to the Manufacturing Department also in minimizing refinery production costs by permitting the purchase of crude oil stored near the refinery and the sale of crude oil stored at a distance. Such agreements also help in maintaining adequate refinery inventories and facilitate in obtaining the particular grades of crude oil needed for current operations.

Not all producers of crude oil are also refiners. (In that respect those producers of crude oil are unlike Skelly.) Nonrefining producers are numerous and include some of the major producers. There are also nonproducing refiners, some of them in the oil-producing states and some in other states. Minnesota, for example, has at least two refineries operated within its borders by nonproducers.

Enterprises which both produce and refine sometimes separate the two operations legally by incorporating one or the other, or both, as subsidiaries. Examples are the Standard Oil Company of Indiana and the Barnsdahl Oil Company. It appears that the production and refining of crude oil involve differing skills. They each can be and are carried on profitably as separate enterprises. Refiners and producers have separate trade associations. Refinery employees and production employees each have separate union contracts even where there is but one employer, as in Skelly's case.

During the taxable years here involved, Skelly produced crude oil in not less than 15 midcontinent states. In all but 2 of the 15 states, and also in Canada, beginning in 1957, every barrel of oil and gas produced was sold to outside interests. In most of these areas there was neither intent nor prospect that it would be otherwise. This was so even in Colorado where Skelly has a refinery as well as production operations. Acquisition of the Denver refinery had no relation to the existence of production properties in Colorado, and in 1955, for example, of the 1,128,575 barrels of crude oil produced in that state not a single barrel was refined in the Denver refinery, all being sold to outside interests.

On an overall basis, during none of the taxable years was there ever as much as 10 percent of Skelly's annual production of crude oil even delivered to the pipelines serving its own refineries, and when account is taken of the fact that of the quantity so delivered a portion was thereafter sold to outside parties, the percentage that found its way into Skelly's own refineries was never as high as 9 percent. In computing net income from Skelly's production operations on the one hand and from its manufacturing and marketing operations on the other, all profits derived from operation of the company's lease gathering systems are credited to the Oil and Gas Production Department and all derived from the operation of the pipeline gathering systems are carried into manufacturing profits, notwithstanding that in the latter case a substantial part of the crude oil transported is sold to outside interests. General and administrative or overhead expenses, such as the expenses incurred by the several administrative or service de-

partments and the executive offices, are divided between the departments on the basis of comparative direct operating expenses. This is the basis which must be observed in computing the deduction for percentage depletion allowed for Federal tax purposes. The record is thus clear that Skelly's refining and marketing operations do not serve to increase the amount of the company's production income, which is fully earned at the point where the crude oil is available for sale. Where the production operations cease, the value of the crude oil produced is always represented by the posted field price.

In all producing states which impose income taxes Skelly is required to pay taxes on the whole of its production income, measured by the posted field prices, derived within the taxing state's borders. Such prices are also taken as determinative of fair market value for purposes of state severance or production taxes, in computing allowable depletion deductions under the Internal Revenue Code, and in determining the production shares of royalty owners.

In its Minnesota returns Skelly included in income apportionable to Minnesota under Minn. St. 290.17(4) only such income as was derived from its manufacturing and marketing operations.[1] The com-

---

[1]Minn. St. 290.17 reads in part as follows: "Items of gross income shall be assigned to this state or other states or countries in accordance with the following principles:

"(1) The entire income of all resident or domestic taxpayers from compensation for labor or personal services, or from a business consisting principally of the performance of personal or professional services, shall be assigned to this state, and the income of non-resident taxpayers from such sources shall be assigned to this state if, and to the extent that, the labor or services are performed within it; all other income from such sources shall be treated as income from sources without this state;

"(2) Income from the operation of a farm shall be assigned to this state if the farm is located within this state and to other states only if the farm is not located in this state. Income and gains received from tangible property not employed in the business of the recipient of such income or gains, and from tangible property employed in the business of such recipient if such business consists principally of the holding of such property and the collection of the income and gains therefrom, shall be assigned to this state if such property has a situs within it, and to other states only if it has no situs in this state. Income or gains from intangible personal

missioner of taxation filed orders determining that additional taxes were owing, based mainly on increasing the reported income by adding thereto a portion of the taxpayer's production income. The parties are agreed that, except in respect of the amount of the deduction allowed for Federal income taxes paid, these orders were based on correct computations, both of the taxpayer's production income and of its apportionable income derived from manufacturing and marketing.

The commissioner in apportioning a part of Skelly's production income to this state on the basis of the statutory three-factor formula[2]

---

property not employed in the business of the recipient of such income or gains, and from intangible personal property employed in the business of such recipient if such business consists principally of the holding of such property and the collection of the income and gains therefrom, whereever held and whether in trust or otherwise, shall be assigned to this state if the recipient thereof is domiciled within this state; provided that income or gains from such property held in trust shall be assigned to this state if the recipient of such income is domiciled within this state and such income or gains would be taxable to such recipient under section 290.22, or if the grantor of such trust is domiciled within this state and such income or gains would be taxable to such grantor under section 290.29;

"(3) Income derived from carrying on a trade or business, including in the case of a business owned by natural persons the income imputable to the owner for his services and the use of his property therein, *shall be assigned to this state if the trade or business is conducted wholly within this state,* and to other states if conducted wholly without this state. This provision shall not apply to business income subject to the provisions of clause (1);

"(4) When a trade or business is carried on partly within and partly without this state, the entire income derived from such trade or business, including income from intangible property employed in such business and including, in the case of a business owned by natural persons, the income imputable to the owner for his services and the use of his property therein, *shall be governed, except as otherwise provided in sections 290.35 and 290.36, by the provisions of section 290.19, notwithstanding any provisions of this section to the contrary. This shall not apply to business income subject to the provisions of clause (1)."* (Italics supplied.)

[2]See, Minn. St. 290.19, subd. 1(2)(a), and Minn. St. 1949, § 290.19, subd. 1(1).

made a determination of the extent to which the taxpayer's sales, tangible property, and payroll related to production and that ratio which these amounts were of the taxpayer's total sales, tangible property, and payroll.[3] This ratio, it will be observed, is very substan-

---

[3]Minn. St. 290.19 reads in part as follows:

"Subdivision 1. The taxable net income from a trade or business carried on partly within and partly without this state shall be computed by deducting from the gross income of such business, wherever derived, deductions of the kind permitted by section 290.09, so far as connected with or allocable against the production or receipt of such income. The remaining net income shall be apportioned to Minnesota as follows:

"(1) If the business consists of the manufacture in Minnesota or within and without Minnesota of personal property and the sale of said property within and without the state, the remainder shall be apportioned to Minnesota on the basis of the percentage obtained by taking the arithmetical average of the following three percentages:

"(a) The percentage which the sales made within this state and through, from or by offices, agencies, branches or stores within this state is of the total sales wherever made;

"(b) The percentage which the total tangible property, real, personal, and mixed, owned or used by the taxpayer in this state in connection with such trade or business is of the total tangible property, real, personal, or mixed, wherever located, owned, or used by the taxpayer in connection with such trade or business; and,

"(c) The percentage which the taxpayer's total pay-rolls paid or incurred in this state or paid in respect to labor performed in this state in connection with such trade or business is of the taxpayer's total pay-rolls paid or incurred in connection with such entire trade or business;

"(d) The percentage of such remainder to be assigned to this state shall not be in excess of the sum of the following percentages: 70 percent of the percentage determined under clause (1)(a), 15 percent of the percentage determined under clause (1)(b), and 15 percent of the percentage determined under clause (1)(c);

"(2) (a) In all other cases the remainder shall be apportioned to Minnesota on the basis of the percentage obtained by taking the arithmetical average of the following three percentages:

"(1) The percentage which the sales, gross earnings, or receipts from business operations, in whole or in part, within this state bear to the total sales, gross earnings, or receipts from business operations wherever conducted;

tially different from the ratio which production income is of the total income. For example, in 1955, a representative year, sales, tangible property, and payroll relating to production averaged only 37 percent of the total sales, tangible property, and payroll, yet production accounted for 74 percent of the company's total profit. In contrast, manufacturing and marketing, which, on an average, was represented

---

"(2) The percentage which the total tangible property, real, personal, and mixed, owned or used by the taxpayer in this state in connection with such trade or business is of the total tangible property, real, personal, or mixed, wherever located, owned, or used by the taxpayer in connection with such trade or business; and

"(3) The percentage which the taxpayer's total pay-rolls paid or incurred in this state or paid in respect to labor performed in this state in connection with such trade or business is of the taxpayer's total pay-rolls paid or incurred in connection with such entire trade or business;

"(4) The percentage of such remainder to be assigned to this state shall not be in excess of the sum of the following percentages: 70 percent of the percentage determined under clause (2)(a), 15 percent of the percentage determined under clause (2)(b), and 15 percent of the percentage determined under clause (2)(c);

\* \* \* \* \*

"Subd. 2. The methods prescribed by subdivision 1 shall apply wherever and in so far as the business carried on within this state is an integral part of a business carried on both within and without this state."

Minn. St. 1949, § 290.19, subd. 1(2), applicable to the years 1951 and 1952, reads as follows: "(2)(a) In all other cases the proportion of such remainder to be assigned to this state shall be that which the sales, gross earnings, or receipts from business operations, in whole or in part, within this state bear to the total sales, gross earnings, or receipts from business operations wherever conducted;

"(b) If the methods prescribed under clause (2)(a) will not properly reflect taxable net income assignable to the state, there shall be used, if practicable and if such use will properly and fairly reflect such income, the arithmetical average of the three percentages set forth in clauses (1)(a), (1)(b), and (1)(c), of this section, or the separate or segregated accounting method."

Minn. St. 290.20 provides in part: "The methods prescribed by section 290.19 shall be presumed to determine fairly and correctly the taxpayer's net income allocable to this state. Any taxpayer feeling aggrieved by the application to his case of the methods so prescribed may petition the

by 63 percent of the total sales, tangible property, and payroll, accounted for a mere 26 percent of the total profit. Skelly contends, and the record so discloses, that the part of its production income which the commissioner added to the reported apportionable income was that percentage of the production income which the crude oil sales made by Skelly's Oil and Gas Production Department to its Manufacturing Department was of the total of the taxpayer's production and its purchases of crude oil. In other words, the part excluded was the percentage which taxpayer's crude oil sales to others was of its total production and purchases. The percentage included was approximately 40 and that excluded approximately 60.

The Board of Tax Appeals found that the inclusion of 40 percent of production income in the apportionable income "resulted in attributing to Minnesota a percentage of income out of all proportion to the business transacted by taxpayer in Minnesota." The board was of the opinion, also, as was contended by Skelly, that the taxpayer was engaged in two separate businesses, that of "producing" and that of "marketing." Somehow the board nevertheless concluded that the two should be treated as one "[t]o the extent that production goes into marketing activities," on the theory that to this extent the businesses are "integrated." The board concluded further that "the extent that production goes into marketing activities" is measured by the percentage of the taxpayer's own crude oil production which entered pipelines serving the taxpayer's refineries (which it found ranged between a low of 7.49 percent in 1955 and a high of 9.32 percent in 1951) and thus held, contrary to the taxpayer's contention, that this percentage of production income is includible in apportionable income and that when so limited the inclusion does not result in a denial of due process.

---

commissioner for determination of such net income by the use of some other method, including separate accounting. Thereupon, if the commissioner finds that the application of the methods prescribed by section 290.19 will be unjust to the taxpayer, he may allow the use of the methods so petitioned for by the taxpayer, or may determine such net income by other methods if satisfied that such other methods will fairly reflect such net income."

Skelly assigns as error: (1) The holding of the board that Minnesota's taxing statutes permit apportionment to this state of a part of the income derived from the production of crude oil, a separate business conducted wholly without this state; (2) the holding of the board that such apportionment does not deprive Skelly of its property without due process of law, contrary to U. S. Const. Amend. XIV and Minn. Const. art. 1, § 7.[4]

The taxpayer contends that since none of its business of producing and selling crude oil is conducted within Minnesota taxation by this state of any of its income from that business would deprive it of its property without due process of law.

Minn. St. 271.10, subd. 1, provides for a review of any final order of the Board of Tax Appeals in the following language:

"A review of any final order of the board of tax appeals may be had upon certiorari by the supreme court upon petition of any party to the proceedings before the board. Such review may be had on the ground that the board was without jurisdiction, that the order of the board was not justified by the evidence or was not in conformity with law, or that the board committed any other error of law."

Minn. St. 271.11 provides that orders shall be prima facie evidence of facts.

A review by this court of a decision of the Board of Tax Appeals is limited to those grounds specified in § 271.10. A decision of the commissioner of taxation, in case of appeal to the Board of Tax Appeals, comes to that board with prima facie validity and if no appellant appears the board must affirm. If appellant does appear, however, the case is tried de novo, which means that either party may introduce evidence and the findings and decision of the board must thereafter be based upon such evidence. Section 271.06, subd. 6, provides that the board shall hear, consider, and determine every appeal de novo upon the issues made by the notice and the return. Section 271.07 requires the making of a verbatim stenographic report of

---

[4]An assignment of error raising the question whether full deduction was allowed of Federal income taxes paid has been withdrawn.

all proceedings had before the board upon appeal. Section 271.08 provides that the board shall determine every appeal by written order containing findings of fact and the board's decision, and that a memorandum of the grounds of the decision shall be appended. Section 271.09 states in what cases the appeal to the Board of Tax Appeals shall constitute the exclusive remedy for reviewing the action of the commissioner respecting any tax, assessment, or other obligation.

This court has said that in reviewing an order or determination of an administrative board it will go no further than to determine whether evidence was such that it might reasonably make the order or determination in question. Village of Aurora v. Commr. of Taxation, 217 Minn. 64, 14 N. W. (2d) 292; Stronge & Lightner Co. v. Commr. of Taxation, 228 Minn. 182, 36 N. W. (2d) 800.

This court held in Oliver Iron Min. Co. v. Commr. of Taxation, 247 Minn. 6, 10, 76 N. W. (2d) 107, 111:

"* * * [I]n reviewing an order or determination of an administrative board, this court will go no further than to determine: (1) Whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question."

The Board of Tax Appeals found that the actual percentage of Skelly's crude oil production entering its own pipeline amounted to 9.32 percent for 1951; 7.93 percent for 1952; 8.02 percent for 1953; 8.89 percent for 1954; and 7.49 percent for 1955. The board's findings of fact are accepted by Skelly as correct.

The board further found that in applying the three-factor formula prescribed by § 290.19, to obtain the percentage of income subject to tax in Minnesota, the commissioner excluded from the total sales factor of the denominator 100 percent of the sales attributable to production operations, but did include 40 percent of the property and payroll factors attributable thereto. The board further found that the failure to include in the denominator of the fraction the same per-

cent of production sales as property and payroll resulted in overstating taxable income by $40,066.82 in 1951; $93,700.34 in 1952; $95,434.18 in 1953; $81,632.85 in 1954; and $91,168.39 in 1955. Thus, the board found that the addition of 40 percent of production income to apportionable income and the application thereto of the formula used by the commissioner resulted in attributing to Minnesota a percentage of income out of all appropriate proportion to the business transacted by the taxpayer in Minnesota.

The board in the memorandum attached to its decision makes the following statement:

"Under the facts as we have found them and to which the commissioner for the most part agrees, there can be little question that the taxpayer was engaged in two separate businesses. The business of producing was in no way dependent upon the business of marketing. Each business could be operated entirely independent of each other. Some companies are engaged only in the producing business and some only in the marketing and refining. *All producing income is fully earned at the well-head and is not increased or affected by the manufacturing and marketing activities.*

"Under our interpretation of the Minnesota law and the Minnesota cases interpreting that law as well as the United States Supreme Court decisions in allocation cases in general, *unless there can be shown some connection or interdependence between the two businesses, in this case production and marketing, none of the income from production could be allocated to Minnesota for income tax purposes.*

"We agree with taxpayer's contention that a taxpayer may have several businesses and that Section 290.17 does not state or require that if one of them crosses a state line into Minnesota, then all of its businesses shall be thrown into a hotchpotch and apportionment made of the total taxable net income of all of them as a unit. There is nothing to indicate that the legislature ever intended such a result. [To this statement the board adds the following footnote: "This has apparently been recognized by the commissioner because he has deleted from total apportionable income approximately 60 percent of

the production income."] The wording of Subdivision 2 of Section 290.19 (supra) seems to strengthen this conclusion and unless the business conducted within Minnesota is integrated with another business outside Minnesota, the two shall be considered as separate businesses.

*"The proof presented here by taxpayer by way of expert testimony and exhibits, that the business of producing is separate from that of marketing, was conclusive.* This is also the view adopted by courts in oil producing states." (Italics supplied.)

The board then refers in its memorandum to taxpayer's contention that because it operates two businesses the entire income of the one which does no business in Minnesota must therefore be exempt from taxation in Minnesota even though a portion of production in the instant case goes into marketing and refining, the business which is subject to taxation in Minnesota.

The board then cites definitions of "unitary business" found in Western Auto Supply Co. v. Commr. of Taxation, 245 Minn. 346, 71 N. W. (2d) 797, and states that "[i]t seems apparent to the board that under the assumed circumstances, income from both production and marketing would come within the above definitions, even though technically each might be a separate business." The board expresses the view that the meaning of the word "unitary" as used in the Western Auto case and the statutory word "integral" as used in allocation cases is the same. They do, however, stress the fact that in this case they are faced with a vastly different situation than that involved in the Western Auto case. The board goes on to say:

"* * * Instead of 100% of production going into marketing activities, we have something under 10% for each of the years involved. To the extent that production goes into marketing activities we believe the businesses are integrated, and to the extent that production income in this same percentage is used for apportionment, Minnesota can subject the same to a tax without violating the due process clauses."

The board then cites the Western Auto Supply case; Marshall-

Wells Co. v. Commr. of Taxation, 220 Minn. 458, 20 N. W. (2d) 92; and Butler Brothers v. McColgan, 315 U. S. 501, 62 S. Ct. 701, 86 L. ed. 991, suggesting that nothing has been said in these cases which would lead to any different conclusion. The board fails to discuss or refer to the fact that Skelly's refining and marketing operations do not serve to increase the amount of the company's production income, which is fully earned at the point where the crude oil is available for sale; that it is there that production operations cease; and that the value of the crude oil produced is represented by the posted field price, a bona fide competitive price. Neither the commissioner, the board, nor anyone else disputes that Skelly is required, in all oil-producing states which impose income taxes, to pay such taxes on the whole of its production income, measured by the posted field prices, derived within each taxing state's borders, and that such prices are also taken as determinative of fair market value for purposes of state severance or production taxes, in computing allowable depletion deductions under the Internal Revenue Code, and in determining the production shares of royalty owners.

Under the circumstances the Board of Tax Appeals was clearly justified upon the record in finding that the taxpayer was engaged in two separate businesses; that the business of producing was in no way dependent upon the business of marketing; that each business could be operated entirely independent of each other; and that all producing income is fully earned at the well-head and is not increased or affected by Skelly's manufacturing and marketing activities. The board admitted in its memorandum that the proof presented by Skelly that the business of producing is separate from that of marketing was conclusive. It further stated that this view is also the view adopted by courts in oil-producing states.

Although in Stronge & Lightner Co. v. Commr. of Taxation, 228 Minn. 182, 36 N. W. (2d) 800, this court was concerned with the construction of § 290.19 rather than § 290.17, our statement (228 Minn. 197, 36 N. W. [2d] 808) that in determining whether one provision of a taxing statute is applicable rather than another "[t]he

test is not which method will produce the greatest revenue for the state of Minnesota" seems apt here.

If Skelly's production operations are in fact a business separate from its marketing operations under § 290.17(3), as found by the board, all income produced by those operations is assignable to other states. Of course, if that were not the case, and if the production operations and the manufacturing and marketing operations constituted a single business, then under § 290.17(4), subject only to the requirements of due process, the income of the two together would be apportionable within and without Minnesota in accordance with whatever method is appropriate under § 290.19. However, since the production operations are carried on wholly outside of Minnesota and since the income they produce is fully earned at the point of production, it must necessarily follow that § 290.17(3) is applicable only to Skelly's marketing-operations income and that none of its production income is apportionable to Minnesota.

■ The record is clear that the board has bypassed its own finding that the two businesses were separate. Its conclusions that any of the production income is apportionable to Minnesota have no support in the findings and neither the record nor the evidence reasonably sustains such a determination. Skelly's production income was already subject to being taxed in full at the point of production. While taxation of the same income more than once may not be unlawful, depending upon circumstances, Cream of Wheat Co. v. County of Grand Forks, 253 U. S. 325, 330, 40 S. Ct. 558, 560, 64 L. ed. 931, 934, it is nevertheless offensive to common concepts of what constitutes fairness, particularly when it is multiple taxation of the sort the board's unsupported conclusion produces in the instant case.

■ Our present concern is only with the extent to which § 290.17 reaches, and that is to be measured by its terms—not by what is constitutionally permissible. There is no evidence here to the effect that our legislature intended or has sought, in § 290.17, to use its taxing powers to the limits allowed by due process. We think the evidence is to the contrary. As Skelly points out, had the legislature been so minded it could have validly provided for a tax on income re-

ceived by a resident as rental from foreign real property. See, Lawrence v. State Tax Comm. 286 U. S. 276, 52 S. Ct. 556, 76 L. ed. 1102, 87 A. L. R. 374. The legislature has not chosen to do so (see § 290.17[2]) even though some states tax residents on foreign rental income. It must be plain, therefore, that it adds nothing to the validity of the board's application of § 290.17 in this case to urge that its decision does not go beyond what the legislature could have done without transgressing due process.

■ We think that the board reached manifestly sound and inescapable conclusions in determining that the taxpayer's production operations and its manufacturing and marketing operations constitute separate businesses and that paragraphs (3) and (4) of § 290.17 require that where a taxpayer has more than one nonpersonal service business each must be dealt with separately and the income from each assigned or apportioned to Minnesota only if that particular business is conducted in Minnesota, either in whole or in part. The board's abrupt disregard of these conclusions by the application of any formula under § 290.19 is plainly contrary to the legislative mandate embodied in § 290.17(3, 4). There is no basis under the board's findings or the statute for adding to Skelly's marketing income any percentage of its production income in view of the undisputed facts that its production operations are carried on wholly outside of Minnesota and its income therefrom fully earned at the point of production.

What the board did appears to have been impelled by a belief on its part that it had no alternative in view of certain statements made by this court in Western Auto Supply Co. v. Commr. of Taxation, *supra*. However, we are unable to see how that case compels disregard of § 290.17(3, 4), or of the board's findings that Skelly's production and marketing operations were separate businesses. The board itself said that the proof presented by Skelly on this issue was "conclusive." The issue in the Western Auto case was not, as here, whether the taxpayer was engaged in several businesses, one of them carried on wholly outside of Minnesota, with consequent questions of the assignment of income under § 290.17(3) with re-

spect to that business and under § 290.17(4) with respect to the others. The opinion does not mention § 290.17 because the parties to that lawsuit assumed that § 290.17(4) made § 290.19 applicable and their dispute related solely to which of two methods of apportionment provided for in § 290.19 was applicable in the particular circumstances of the case, taxpayer there apportioning income on the basis of "separate accounting" and the commissioner on the basis of the "three-factor formula." The Board of Tax Appeals upheld the commissioner and the sole issue before this court was whether the taxpayer had proved that the board's order was not justified by the evidence. (See, Minn. St. 271.10, subd. 1.) We held that it had not done so.

We fail to see where the board has spelled out which of the "various tests" laid down in the Western Auto case it regarded as requiring the amalgamation of production and marketing *income* which it sought to make in the case at bar. What it did was simply to quote so-called definitions from that case relating to what for tax purposes constitutes a "unitary business"—which can only be understood to mean, when read in context, a single business—and then to state a belief that under the assumed circumstances income from both production and marketing could come within these definitions even though technically each might be a separate business.[5] We see no basis under the ruling in that case for assuming circumstances under which income from both production and marketing under the facts here would come within the definitions of a single business. These definitions in the Western Auto case in effect state that whether a number of business operations having common ownership constitute a single or unitary business or several separate businesses for tax purposes depends upon whether they are of "mutual benefit" to one another and on whether each is dependent on or contributory to the others. Under the circumstances here the board could scarcely have been thinking in terms of "mutual benefit," having found that Skelly's marketing was of no benefit to its production operations since all pro-

---

[5] We believe the board inadvertently misspoke when it referred to "income" as being within the "definitions" which, of course, are not of "income" and do not speak in terms of or mention "income."

duction income was "fully earned" at the point where the crude oil was available for sale or transfer at a posted field price. Neither could the board have been thinking in terms of dependency since it had found that production was "in no way dependent upon the business of marketing."

Our statements relating to what constitutes a unitary or single business for tax purposes in the Western Auto case were never intended to have any application broader than called for by the particular set of facts and the specific controversy then before this court. As was said in Sinclair v. United States, 279 U. S. 749, 767, 49 S. Ct. 471, 477, 73 L. ed. 938, 947, "Always the language used in an opinion must be read in the light of the issues presented." To apply definitions from the Western Auto case as the board has sought to apply them in this case could lead to manifestly unsound conclusions. As already noted, those definitions were directed toward the solution of a different problem arising under another statute and involving vastly different facts. In that case, as well as in Hans Rees' Sons v. North Carolina, 283 U. S. 123, 51 S. Ct. 385, 75 L. ed. 879, decisions cited by both parties here, there was plainly but one business and no contention to the contrary was advanced in either case.

The commissioner has cited Butler Brothers v. McColgan, *supra*; Bass, Ratcliff & Gretton, Ltd. v. State Tax Comm. 266 U. S. 271, 45 S. Ct. 82, 69 L. ed. 282; and Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, 41 S. Ct. 45, 65 L. ed. 165, as authority for the immunity of the apportionment formulas from attack. The Supreme Court of the United States said in the Hans Rees' Sons case (283 U. S. 134, 51 S. Ct. 389, 75 L. ed. 906):

"\* \* \* When, as in this case, there are different taxing jurisdictions, each competent to lay a tax with respect to what lies within, and is done within, its own borders, and the question is necessarily one of apportionment, evidence may always be received which tends to show that a state has applied a method, which, albeit fair on its face, operates so as to reach profits which are in no just sense attributable to transactions within its jurisdiction."

Under attack in that case was the validity of a statutory method of

apportionment applied by North Carolina to income derived from operations carried on both within and without that state. The state court had held that because the operations constituted what is characterized as a "single business enterprise"—a "unitary business"—the statutory method was immune to attack. The Supreme Court disagreed. It said that evidence lacking in the Underwood and Bass cases was present and that this evidence showed that (283 U. S. 135, 51 S. Ct. 389, 75 L. ed. 908):

"* * * the statutory method, as applied to the appellant's business for the years in question operated unreasonably and arbitrarily, in attributing to North Carolina a percentage of income out of all appropriate proportion to the business transacted by the appellant in that state. In this view, the taxes as laid were beyond the state's authority."

No other conclusion is permissible here if production income, no matter what the percentage, is included in apportionable income because of the fact that Skelly's sole activity in Minnesota has been and is the marketing of finished products. Under the circumstances, Minnesota may include in the measure of its income tax only such income as is attributable to that activity. It may not include any production-operations income if it does not appear that the included portion is fairly attributable to the marketing operations reaching into this state.

The United States Supreme Court said in Butler Brothers v. McColgan, 315 U. S. 501, 507, 62 S. Ct. 701, 704, 86 L. ed. 991, 996, that the test is whether the state is taxing only income "created by business within its borders." In the Butler Brothers case the taxpayer, a wholesale merchandiser, had and operated distributing houses in seven states, including California, in which the taxpayer engaged only in selling, all purchasing being carried on elsewhere by a central buying division which was able to buy at prices below those available to the several houses individually. The Supreme Court held that a portion of the savings effected at the central buying division was fairly attributable to the volume contributed by the California distributing house and was brought about in part by what the taxpayer

was doing in California and that thus to the extent the profits were earned within the borders of California, including them in the measure of California's tax was not a denial of due process. The case marks the extreme limit to which a state has been permitted to go under due process clauses in taxing income of a foreign corporation doing business both within and without its boundaries.[6] The condition justifying taxation in that case is not present here. As was emphasized in the Butler Brothers case, a state may tax only income "created by business within its borders." Clearly, the fact that Skelly's production income is fully earned at the point where the crude oil is produced and is neither more nor less than what it would be if Skelly had no refineries, distinguishes the situation here from that case. Skelly's sole activity in Minnesota is the marketing of finished products, as the proof clearly shows. The only permissible conclusion is that taxes based on the inclusion of production income, no matter what the percentage, in apportionable income are beyond the state's authority. Minnesota may include in the apportionable income subject to its tax only income attributable to Skelly's marketing activity. See, Northwestern States Portland Cement Co. v. Minnesota, 358 U. S. 450, 79 S. Ct. 357, 3 L. ed. (2d) 421, 67 A. L. R. (2d) 1292.

The commissioner cites Superior Oil Co. v. Franchise Tax Bd. 60 Cal. (2d) 406, 34 Cal. Rptr. 545, 386 P. (2d) 33, and Honolulu Oil Corp. v. Franchise Tax Bd. 60 Cal. (2d) 417, 34 Cal. Rptr. 552, 386 P. (2d) 40, a companion case, as involving corporations carrying on operations similar to Skelly's and appears to place considerable reliance on these cases. The corporations apparently explored for and produced crude oil but did not refine and market the resulting products (as does Skelly). The sole issue as we see it in both cases was whether the portion of income from the taxpayers' interstate production operations which was taxable in California should be computed on the basis of a statutory apportionment formula similar to that which the commissioner applied to Skelly's interstate refining and marketing income or whether it should be computed on the basis of a

---

[6]See, *Federal Limitations on State Taxation of Interstate Business,* 75 Harv. L. Rev. 953, 1015.

separate accounting. The apportionment formula was held controlling in each instance on the ground (contrary to the contention of the Franchise Tax Board in the Honolulu case) that the *taxpayer's production business* was a "unitary business." Neither of those cases, however, gives any support to the commissioner's contention that Skelly's production operations and its refining and marketing operations are a single business and should be treated as such for purposes of § 290.17.

■ Since we have reached the conclusion that there must be a reversal on the grounds that the provisions of § 290.19 are not applicable, other questions raised on this appeal need not be discussed. The Board of Tax Appeals has found conclusively that Skelly's production operations and marketing operations constitute separate, independent businesses; that only the marketing operations are carried on within the borders of Minnesota; and that the income of each business has been determined correctly and is independent of that of the other. Under the circumstances, only § 290.17(3) applies as the governing tax statute, so far as concerns income from taxpayer's separate production business.

The taxpayer is entitled to exclusion of income derived from production and sale of crude oil outside Minnesota from taxable income subject to apportionment under §§ 290.17(4) and 290.19. Its marketing operations remain subject to § 290.17(4) for taxing purposes.

Reversed and remanded.

MR. JUSTICE SHERAN took no part in the consideration or decision of this case.