# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A16-0741

TCI Business Capital, Inc.,
Appellant,

vs.

Five Star American Die Casting, LLC, et al.,
Defendants,

Brian T. Flynn,
Respondent.

**Filed January 23, 2017**
**Affirmed in part, reversed in part, and remanded**
**Johnson, Judge**
**Concurring in part, dissenting in part, Reyes, Judge**

Dakota County District Court
File No. 19HA-CV-14-2708

Sonia Miller-Van Oort, Robin M. Wolpert, Sapientia Law Group, PLLC, Minneapolis, Minnesota (for appellant)

Carl E. Christensen, Christensen Law Office PLLC, Minneapolis, Minnesota (for respondent)

Considered and decided by Johnson, Presiding Judge; Reyes, Judge; and Tracy M. Smith, Judge.

# S Y L L A B U S

The district court erred by granting summary judgment to respondent on appellant's claims of fraudulent misrepresentation and breach of fiduciary duty. Appellant has established respondent's liability on those two claims. The amount of appellant's damages is to be determined by a factfinder at trial.

# OPINION

**JOHNSON**, Judge

An officer of a corporation falsified company records to show that a customer's debt to the corporation was approximately $250,000 less than what the customer actually owed. The corporation was unaware of the inaccuracy of its records when it entered into a settlement agreement with the customer that resolved the debt for less than what was owed and less than what the corporation believed was owed. The corporation later discovered the false records created by the officer, who since had left his employment. The corporation sued the former officer for conversion, civil theft, fraudulent misrepresentation, and breach of fiduciary duty. The district court denied the corporation's motion for summary judgment and granted summary judgment in favor of the former officer on all four claims. We affirm in part with respect to the claims of conversion and civil theft, reverse in part with respect to the claims of fraudulent misrepresentation and breach of fiduciary duty, and remand for trial on the issue of damages with respect to the latter two claims.

## FACTS

TCI Business Capital, Inc., is a commercial factoring company. It provides financing to companies and assists in the collection of accounts receivable. From September 2010 to March 2013, Brian T. Flynn was employed by TCI as its chief risk officer. In that capacity, Flynn oversaw the credit, collections, legal, and external audit functions of TCI. Flynn reported to TCI's CEO.

During Flynn's employment, Five Star American Die Casting, LLC, was a customer of TCI. In June 2010, TCI and Five Star entered into a factoring agreement in which TCI agreed to advance funds to Five Star while seeking payments from Five Star's debtors, and Five Star agreed to pay a fee to TCI and to remain responsible for accounts that were uncollectible. Five Star's owner provided TCI with a personal guaranty of Five Star's obligations. TCI provided funding to Five Star for nearly two years. In March 2012, when Five Star owed TCI $342,998.49, TCI exercised its contractual rights by seizing Five Star's equipment, in which TCI had a security interest. Flynn assumed responsibility for overseeing the liquidation of Five Star's equipment.

By September 2012, Five Star's debt to TCI had increased to $446,879.27. TCI's CEO directed Flynn to arrange for Five Star's equipment to be sold at an auction. Flynn believed that TCI could obtain greater proceeds by selling Five Star's equipment in individual sales rather than at a single auction. Without discussing the matter with anyone at TCI, Flynn unilaterally decided to not organize an auction but, rather, to sell Five Star's equipment piece by piece. He concealed his plan from others and informed TCI management and other co-workers that he was working to arrange an auction and that an auction had been scheduled.

On December 17, 2012, Flynn credited Five Star's account by $250,378.40. He represented to TCI management and other co-workers that this amount was the proceeds of an auction of Five Star's equipment. In reality, no auction was held. Rather, Flynn created a somewhat elaborate series of false transactions involving another TCI customer, which we will call Company X. Flynn created false invoices, purchasing orders, packing

3

lists, and bills of lading, which suggested that Company X had sent products worth $313,048 to a retailer.  Flynn sent documents to Company X to indicate that TCI would purchase the receivable from Company X.  Flynn directed TCI's finance department to wire $250,378.40 to an agent of Company X, which purportedly represented the amount for which TCI would purchase the receivable.  A day later, Flynn contacted Company X's agent and said that TCI's treasury department had made a mistake and that the agent should wire the money back to TCI, with a notation referring to Flynn and Five Star, and the agent did so.  Flynn told employees in TCI's treasury department that the funds received from Company X were the proceeds of the auction of Five Star's equipment.  TCI treasury employees received a wire transfer of $250,378.40 and applied the funds to Five Star's account.  The credit to Five Star's account appeared to reduce the amount of Five Star's debt to TCI in TCI's accounting system.  At the same time, TCI's records showed that Company X owed the same amount to TCI, but Flynn falsified Company X's monthly reports so that Company X would be unaware that TCI was recognizing such a debt.  Flynn testified candidly in deposition to the details of his scheme.  He testified that he devised and implemented the scheme because his job was at risk due to the company's concerns about his performance and that he wanted to exceed expectations with respect to the Five Star account in order to improve the company's perception of his performance and thereby increase the probability that he would keep his job.

TCI terminated Flynn's employment on March 18, 2013, before he was able to complete his scheme by selling Five Star's equipment piece by piece and adjusting TCI's accounting records.  TCI terminated him for reasons that are unrelated to Five Star or the

4

underlying facts of this case. In fact, when it decided to terminate Flynn, TCI was unaware of Flynn's scheme involving Five Star, Company X, and the retailer. Furthermore, upon being terminated, Flynn did not advise TCI of the scheme. TCI provided Flynn with $35,000 in severance pay in connection with his termination.

TCI later engaged in settlement negotiations with Five Star concerning Five Star's debt. TCI's accounting records showed that Five Star owed TCI $213,238.01. Because of the false $250,378.40 credit, Five Star's debt to TCI actually was $468,616.41. In early May 2013, TCI and Five Star entered into a settlement agreement by which Five Star agreed to pay $84,262.50 to resolve all claims TCI had against Five Star and its owner.

TCI discovered Flynn's scheme in June 2013. Thereafter TCI adjusted Company X's account to reflect that Company X did not owe $250,378.40 to TCI. The record does not reflect the ultimate disposition of the equipment that TCI seized from Five Star pursuant to its security interest.

In September 2014, TCI commenced this action against Five Star, its owner, and Flynn. TCI later voluntarily dismissed its claims against Five Star and its owner. TCI's amended complaint alleged four claims against Flynn: (1) conversion, (2) civil theft, (3) fraudulent misrepresentation, and (4) breach of fiduciary duty. After discovery, TCI moved for summary judgment in its favor on all four claims. In August 2015, the district court issued an order in which it denied TCI's motion for summary judgment and granted summary judgment in favor of Flynn on all four of TCI's claims. TCI appeals.

**ISSUES**

I.      Did the district court err in its ruling on TCI's claim of conversion?

II.     Did the district court err in its ruling on TCI's statutory claim of civil theft?

III.    Did the district court err in its ruling on TCI's claim of fraudulent misrepresentation?

IV.     Did the district court err in its ruling on TCI's claim of breach of fiduciary duty?

**ANALYSIS**

TCI argues that the district court erred by denying its motion for summary judgment and by granting summary judgment in favor of Flynn.

A district court must grant a motion for summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. A genuine issue of material fact exists if a rational trier of fact, considering the record as a whole, could find for the nonmoving party. *Frieler v. Carlson Mktg. Grp.*, 751 N.W.2d 558, 564 (Minn. 2008). This court applies a *de novo* standard of review to the district court's legal conclusions on summary judgment and views the evidence in the light most favorable to the party against whom summary judgment was granted. *Commerce Bank v. West Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015).

## I.  Conversion

TCI argues that the district court erred in its ruling on the claim of conversion.  The supreme court has defined the tort of conversion as

> "an act of willful interference with [the personal property of another], done without lawful justification, by which any person entitled thereto is deprived of use and possession," *Larson v. Archer-Daniels-Midland Co.*, 226 Minn. 315, 317, 32 N.W.2d 649, 650 (1948), and "the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods." *Rudnitski v. Seely*, 452 N.W.2d 664, 668 (Minn. 1990); *accord Hildegarde, Inc. v. Wright*, 244 Minn. 410, 413, 70 N.W.2d 257, 259 (1955).

*Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (alteration in original). The supreme court also has defined the tort to include "an exercise of dominion over the goods which is inconsistent with and in repudiation of the owner's right to the goods or some act done which destroys or changes their character or deprives the owner of possession permanently or for an indefinite length of time." *Hildegarde, Inc.*, 244 Minn. at 413, 70 N.W.2d at 259.  A finding of conversion "is properly limited to those serious, major, and important interferences with the right to control the chattel." *Bates v. Armstrong*, 603 N.W.2d 679, 682 (Minn. App. 2000), *review denied* (Minn. Mar. 14, 2000).

The district court reasoned that TCI cannot prevail as a matter of law on its conversion claim because Flynn did not deprive TCI of an interest in property and did not intend to do so.  TCI contends that the district court erred because its evidence shows conclusively that Flynn caused money to be sent by wire transfer from TCI to Company X and from Company X to TCI and that Flynn caused TCI employees to make accounting

7

entries that credited Five Star's account. TCI contends that these transactions effectively interfered with its property and deprived it of the use and possession of its property.

Before analyzing the parties' respective arguments, it is necessary to characterize the nature of the property at issue. TCI's claim rests on the premise that money in an intangible form is property. That premise is without precedent in Minnesota law. The supreme court's definition of the tort of conversion typically refers to property as "goods." *See, e.g.*, *Rudnitski*, 452 N.W.2d at 668; *Hildegarde, Inc.*, 244 Minn. at 413, 70 N.W.2d at 259. As far as our research reveals, all the opinions of the supreme court on the subject of conversion are concerned with tangible personal property, *i.e.*, items that can be seen and touched. *See, e.g.*, *Hildegarde, Inc.*, 244 Minn. at 413, 70 N.W.2d at 259 (fixtures); *Larson*, 226 Minn. at 316, 32 N.W.2d at 650 (straw); *McDonald v. Bayha*, 93 Minn. 139, 140, 100 N.W. 679, 679 (1904) (furniture); *Williamson v. Prasciunas*, 661 N.W.2d 645, 648 (Minn. App. 2003) (jewelry); *Bates*, 603 N.W.2d at 681 (vehicle).

This court has issued only two precedential opinions concerning a conversion claim based on a transfer of money in an intangible form. Only one of those opinions expressly addressed the question whether money in an intangible form may be converted. In *Halla v. Norwest Bank, N.A.*, 601 N.W.2d 449 (Minn. App. 1999), *review denied* (Minn. Dec. 14, 1999), the plaintiff alleged that a bank engaged in conversion by crediting the account of a person who had stolen cash from the plaintiff and had deposited the cash in his own bank account. *Id.* at 453. We rejected the plaintiff's claim and stated, "Because cash is liquid and designed to be transferred, it is 'a subject of conversion only when it is capable of being identified, and described as a specific chattel.'" *Id.* (quoting 89 C.J.S. *Trover &*

8

*Conversion* § 23, at 541 (1955)).[1] We understand this statement in *Halla* to mean that a conversion claim is viable with respect to money only if the money is in a tangible form (such as a particular roll of coins or a particular stack of bills) and is kept separate from other money. That understanding is consistent with the traditional common-law rule that an electronic financial transaction cannot be the basis of a conversion claim. *See* Dan B. Dobbs et al., *Hornbook on Torts* § 6.5, at 111 (2d ed. 2000). We are aware that the traditional common-law rule has been modified in some jurisdictions, where the concept of conversion has been expanded to allow claims based on intangible property interests, such as money in a bank account. *See* Dobbs, *supra*, § 44.2, at 1153-54 & nn. 21-22, 27.

In any event, we need not resolve TCI's first contention, that the district court erred by ruling that Flynn did not interfere with TCI's property interests, because TCI cannot prevail on its second contention, that the district court erred by ruling that Flynn did not

---

[1]In the other precedential opinion concerning a conversion claim based on a transfer of money in an intangible form, we did not specifically consider whether conversion is an appropriate theory given the intangible form of the property. In *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907 (Minn. App. 2008), *review denied* (Minn. Jan. 20, 2009), a law firm transferred funds from an escrow account to a client, to another law firm, and to itself. *Id.* at 911-13. A third law firm, which had an attorney lien, sued the first law firm for conversion, among other things. *Id.* at 920. On appeal, neither party questioned whether the money in the escrow account was the type of personal property that could be the subject of a conversion claim, and this court did not consider the issue *sua sponte*. *See id.* at 920-22. Accordingly, we do not recognize *Thomas B. Olson & Associates* as establishing a rule of law that money in a bank account is the type of property that may be converted. *See Skelly Oil Co. v. Commissioner of Taxation*, 269 Minn. 351, 371, 131 N.W.2d 632, 645 (1964) (stating that opinions must be read in light of "the specific controversy then before this court"); *Chapman v. Dorsey*, 230 Minn. 279, 288, 41 N.W.2d 438, 443 (1950) (stating that opinions are not precedential on issues "never raised or called to the attention of the court").

intend to interfere with TCI's property interests. The supreme court has described the intent requirement as follows:

> The intention necessary to subject to liability one who deprives another of the possession of his chattel is merely the intention to deal with the chattel so that such dispossession results. It is not necessary that the actor intend to commit what he knows to be a trespass or a conversion. It is, however, necessary that his act be one which he knows to be destructive of any outstanding possessory right, if such there be.

*Christensen*, 658 N.W.2d at 586 (quoting Restatement (Second) of Torts § 222 cmt. c (1965)). The undisputed facts are that, when Flynn caused funds to be sent by wire transfer to and from TCI, and when he caused TCI to make accounting entries with respect to Five Star, he did not intend to interfere with any property interest of TCI. Rather, he intended that TCI's funds would be returned to TCI, which is what occurred, and he intended that TCI's accounting entries would be reversed after TCI received the proceeds of individual sales of Five Star's assets. The results that Flynn intended would not have deprived TCI of possession of a property interest "permanently or for an indefinite length of time," as required by the caselaw concerning conversion. *See Hildegarde, Inc.*, 244 Minn. at 413, 70 N.W.2d at 259. Accordingly, even if conversion of money in an intangible form could occur by wire transfers or accounting entries, Flynn did not intend to interfere with TCI's interest in its property. The lack of the requisite intent is a sufficient reason to affirm the district court's ruling on TCI's conversion claim.

Thus, the district court did not err by denying TCI's motion for summary judgment and entering summary judgment for Flynn on TCI's claim of conversion.

## II. Statutory Civil Theft

TCI argues that the district court erred in its ruling on the claim of civil theft. By statute, "A person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." Minn. Stat. § 604.14, subd. 1 (2016). The statute appears to be intended primarily to provide for a recovery if merchandise or other property is stolen from a retail store. *See id.* § 604.14, subds. 1, 2. The statute authorizes potent remedies: liability for the value of the property stolen and punitive damages in the same amount. *Id.* § 604.14, subd. 1. The statute further provides, "The recovery of stolen property by a person does not affect liability under this section, other than liability for the value of the property." *Id.* § 604.14, subd. 5.

The district court reasoned that TCI could not prove its civil-theft claim because Flynn did not steal anything for himself but, rather, merely transferred funds to and from companies and initiated internal accounting entries. TCI contends that the district court erred because Flynn took possession of TCI's money and gave it to Five Star, which benefited him by allowing him to keep his job. In response, Flynn contends that he did not steal TCI's property because he did not dispossess TCI of its money.

The key word in the statute is the word "steals." *See* Minn. Stat. § 604.14, subd. 1. The legislature has not defined the word within chapter 604. "In the absence of a statutory definition, we generally turn to the plain, ordinary meaning of a statutory phrase." *State v. Leathers*, 799 N.W.2d 606, 609 (Minn. 2011). To identify the plain meaning of a particular word used in a statute, it is appropriate to refer to the common usage of the word. *Gassler*

11

*v. State*, 787 N.W.2d 575, 586 n.11 (Minn. 2010); *Swanson v. Brewster*, 784 N.W.2d 264, 274-75 (Minn. 2010); *In re Phillips' Trust*, 252 Minn. 301, 306, 90 N.W.2d 522, 527 (1958).

In common usage, the word "steals" generally means that a person wrongfully and surreptitiously takes another person's property for the purpose of keeping it or using it. For example, a leading dictionary defines the word "steal" to mean "[t]o take, and carry away feloniously [or] to take or appropriate without right or leave, and with intent to keep or make use of wrongfully; as, to steal money or another's goods." *Webster's New International Dictionary* 2465 (2d ed. 1946). Similarly, another dictionary defines the word, when used as a transitive verb, to mean "[t]o take or appropriate without right or leave and with intent to keep or make use of wrongfully." *Merriam-Webster's Collegiate Dictionary* 1220 (11th ed. 2014). The definitions in these lay dictionaries are similar to the definition in the leading legal dictionary: "[t]o take (personal property) illegally with the intent to keep it unlawfully." *Black's Law Dictionary* 1548 (9th ed. 2009). The most relevant definition of the word "use" is "[t]o convert to one's service; to avail oneself of; to employ." *Webster's New International Dictionary* 2806 (2d ed. 1946). If the property at issue is money in an intangible form, the property is "used" only if a person spends the money or invests it.

Given this meaning of the word "steals," TCI does not have evidence that Flynn took TCI's property with intent to use it or keep it. The undisputed facts are that Flynn caused money to be transferred from company to company by wire transfers and that he caused TCI to make certain accounting entries, with the intent to make Five Star's debt to

TCI appear temporarily to be less than it actually was. There is no evidence that Flynn intended to keep the money at issue or that he actually kept it. There also is no evidence that Flynn intended to use the money at issue or that he actually used it by spending it or investing it or that he intended to allow Five Star to so use it. The dictionary definitions of the word "steals" do not include the action of transferring property from its owner to another person and then back to the owner if there is no intent to keep or use the property or to allow another person to keep or use the property. In light of the unusual circumstances of this case, Flynn did not "steal" property belonging to TCI and, thus, did not commit the statutory tort of civil theft.

TCI cites a decision of a federal district court in support of its argument for a broader interpretation of the statute. *See Damon v. Groteboer*, 937 F. Supp. 2d 1048 (D. Minn. 2013) (citing *Popp Telcom, Inc. v. American Sharecom, Inc.*, No. Civ. 96-1177, 2003 WL 1610789 (D. Minn. Mar. 20, 2003), *aff'd*, 361 F.3d 482 (8th Cir. 2004)). A federal court's interpretation of Minnesota law is not binding on this court, though it may have persuasive value. *See Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 330 (Minn. 2000); *Lamere v. St. Jude Med., Inc.*, 827 N.W.2d 782, 788 n.1 (Minn. App. 2013); *In re Estate of Eckley*, 780 N.W.2d 407, 411 (Minn. App. 2010). The decisions in *Popp Telcom* and *Damon* interpreted the civil-theft statute expansively by incorporating the concept of criminal theft, which is broad in light of the applicable statutory definition and the accompanying caselaw. *See Damon*, 937 F. Supp. 2d at 1076-77; *Popp Telcom*, 2003 WL 1610789 at *9. But there is no textual basis for interpreting the civil-theft statute in that manner because the plain language of the statute does not use the word "theft." The word

13

"theft" appears only in the caption of the statute. The legislature has expressly instructed the courts to disregard the captions of statutes: "The headnotes printed in boldface type before sections and subdivisions in editions of Minnesota Statutes are mere catchwords to indicate the contents of the section or subdivision and are not part of the statute." Minn. Stat. § 645.49 (2016); *see also Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 303 & n.23 (Minn. 2000) (stating that "revisor's headnotes are not part of the statute and thus do not determine its scope or meaning").[2]

Thus, the district court did not err by denying TCI's motion for summary judgment and granting summary judgment for Flynn on TCI's claim of civil theft.

## III. Fraudulent Misrepresentation

TCI argues that the district court erred in its ruling on the claim of fraudulent misrepresentation. To prevail on a claim of fraudulent misrepresentation, a plaintiff must prove that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

---

[2]Caselaw pre-dating the enactment of section 645.49 indicates that a statute's caption may be relevant to an inquiry into legislative history. *See Minnesota Express, Inc. v. Travelers Ins. Co.*, 333 N.W.2d 871, 873 (Minn. 1983). But we are not conducting an inquiry into legislative history. Even if we were to do so, we would be disinclined to allow the criminal law to inform our interpretation of a civil statute because the statute itself states, "The filing of a criminal complaint, conviction, or guilty plea is not a prerequisite to liability under this section." Minn. Stat. § 604.14, subd. 4.

14

*Hoyt Props., Inc. v. Production Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (quotation omitted) (alteration in original); *see also Martens v. Minnesota Mining & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn. 2000) (articulating similar seven-factor test); *Davis v. Re-Trac Mfg. Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 38-39 (1967) (articulating similar eleven-factor test).

The district court reasoned that TCI could not prove its fraud claim because (1) TCI does not have evidence sufficient to prove that Flynn intended to induce TCI to rely on his misrepresentation, (2) TCI does not have evidence sufficient to prove that TCI actually relied on Flynn's misrepresentation, and (3) TCI does not have evidence sufficient to prove that Flynn's conduct caused TCI to suffer damages. TCI challenges each of these reasons on appeal.

## A.    Intent to Induce

TCI contends that its evidence establishes that Flynn intended to induce TCI to rely on his misrepresentations because he intended to induce TCI to credit Five Star's account, to believe that an auction had occurred, and to continue to employ him. TCI also contends that "it was entirely foreseeable that TCI would be in a compromised position when settlement of the Five Star account occurred." In response, Flynn contends that he intended only to maximize TCI's return on its business relationship with Five Star.

TCI is correct insofar as it contends that Flynn intended to induce TCI to believe that an auction had occurred and to continue to employ him. But those actions, in and of themselves, did not cause harm to TCI. The pertinent question is whether Flynn's intent to cause TCI to credit Five Star's account and to rely on false internal records satisfies the

15

intent-to-induce element. We are unaware of any Minnesota caselaw that resolves the parties' respective arguments. We find useful guidance in the *Restatement (Second) of Torts*, which explains that the intent-to-induce element of a fraudulent-misrepresentation claim is satisfied if the defendant intended the plaintiff "to act or refrain from action" or "ha[d] reason to expect" that the plaintiff would act or refrain from action. Restatement (Second) of Torts § 531 (1977). A comment explains further: "A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." Restatement (Second) of Torts § 531, cmt. c (citing Restatement (Second) of Torts § 8A (1965) (applied in *Kaluza v. Home Ins. Co.*, 403 N.W.2d 230, 233 (Minn. 1987))). The comment concludes, "Thus one who believes that another is substantially certain to act in a particular manner as a result of a misrepresentation intends that result, although he does not act for the purpose of causing it and does not desire to do so." Restatement (Second) of Torts § 531, cmt. c.

In this case, Flynn testified in deposition about his knowledge of TCI's actions when a customer has an outstanding debt to TCI. In short, Flynn testified that TCI sometimes would resolve a debt by receiving full payment and sometimes would compromise by agreeing to receive partial payment. Flynn also testified that TCI would rely on its internal reports to determine the amount owed and would offer a settlement or pursue legal action based on the amount owed or believed to be owed. This evidence is sufficient to conclusively establish that Flynn "ha[d] reason to expect" that TCI would rely on his misrepresentations concerning TCI's credit to Five Star's account, *see* Restatement (Second) of Torts § 531, and that Flynn should have known that TCI was "substantially

16

certain to act in a particular manner as a result of [his] misrepresentation," Restatement (Second) of Torts § 531, cmt. c. The requisite intent may be present even if Flynn did not reap any personal gain. "It is not necessary to the [fraudulent misrepresentation] action that the person making the representation should receive any benefit from the deceit . . . . The *gravamen* of the charge is that plaintiff has been deceived, to his hurt, not that the defendant has gained an advantage." *Busterud v. Farrington*, 36 Minn. 320, 321-22, 31 N.W. 360, 361 (1887) (quotation omitted). Thus, the undisputed facts show that Flynn intended to induce TCI to rely on his misrepresentations.

## B. Reliance

TCI contends that its evidence establishes that it actually relied on Flynn's misrepresentations by crediting Five Star's account and by referring to its internal records while in settlement discussions with Five Star. TCI's contention is supported by the evidentiary record as well as common sense. A TCI employee executed an affidavit that implies TCI relied on its internal records when it engaged in settlement discussions with Five Star. At that time, TCI's internal records showed that Five Star owed TCI $218,238.01. In reality, Five Star owed TCI $468,616.41. In other words, TCI's internal records showed that Five Star's debt to TCI was $250,378.40 less than the actual debt. TCI naturally would consider the amount owed (or believed to be owed) when engaging in settlement negotiations. We are aware that "[r]eliance is generally a question of fact." *See Hoyt Properties, Inc.*, 716 N.W.2d 366, 374 (Minn. 2006). But this case is unusual because Flynn has not contradicted TCI's evidence of reliance in any way. Thus, the undisputed facts show that TCI relied on Flynn's fraudulent misrepresentations.

17

## C.	Causation and Damages

TCI contends that it incurred a financial injury as a result of Flynn's fraudulent misrepresentations. "In Minnesota, damages for misrepresentation are limited to the actual out-of-pocket loss sustained by the plaintiff as a proximate result of the defendant's fraud and the purchaser's reliance thereon." *Strouth v. Wilkinson*, 302 Minn. 297, 300, 224 N.W.2d 511, 514 (1974). The undisputed evidence shows that TCI settled with Five Star for an amount that is less than the amount Five Star actually owed to TCI and less than what TCI believed was owed. That evidence is sufficient to allow a factfinder to infer that TCI sustained a financial injury because of Flynn's fraudulent misrepresentations. The issue yet to be determined is the extent to which TCI's settlement with Five Star was reduced because of Flynn's fraudulent misrepresentations. The amount of damages to which TCI is entitled is a genuine issue of material fact that must be determined by a factfinder at trial. *See Lehman v. Hansord Pontiac Co.*, 246 Minn. 1, 10-11, 74 N.W.2d 305, 311-12 (1955); *Rosenquist v. Baker*, 227 Minn. 217, 224, 35 N.W.2d 346, 350 (1948).

## D.	Summary

The district court erred by granting summary judgment for Flynn on TCI's claim of fraudulent misrepresentation. The district court did not err by denying TCI's motion for summary judgment on that claim, but the district court was incorrect in reasoning that TCI does not have evidence that is sufficient to prove that Flynn intended to induce TCI to rely on his misrepresentations or that TCI actually relied on Flynn's misrepresentations. Based on the undisputed facts in the summary-judgment record, TCI has established those elements of its claim. But there is a genuine issue of material fact concerning the extent to

18

which Flynn's misrepresentation caused TCI to incur financial injury. Thus, a factfinder must determine the amount of damages to which TCI is entitled.

## IV. Breach of Fiduciary Duty

TCI argues that the district court erred in its ruling on the claim of breach of fiduciary duty. To prevail on a claim of breach of fiduciary duty, a plaintiff must prove four elements: duty, breach, causation, and damages. *Padco, Inc. v. Kinney & Lange*, 444 N.W.2d 889, 891 (Minn. App. 1989), *review denied* (Minn. Nov. 15, 1989). In a business setting, "one entrusted with the active management of a corporation, such as an officer or director, occupies a fiduciary relationship to the corporation." *Miller v. Miller*, 301 Minn. 207, 219, 222 N.W.2d 71, 78 (1974). "An officer shall discharge the duties of an office in good faith, in a manner the officer reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." Minn. Stat. § 302A.361 (2016). "A person exercising the principal functions of an office or to whom some or all of the duties and powers of an office are delegated . . . is deemed an officer for purposes of this section." *Id.*

The district court reasoned that Flynn did not breach his fiduciary duty to TCI because Flynn believed that he was acting in TCI's best interests by executing a plan to minimize its losses on the Five Star account. To the contrary, Flynn did not act in good faith because he engaged in dishonesty toward his employer. "Corporate officers owe the corporation and its stockholders the active duty of honesty and good faith." *Seitz v. Union Brass & Metal Mfg. Co.*, 152 Minn. 460, 462, 189 N.W. 586, 587 (1922). Furthermore, by creating false accounting records, Flynn did not act "with the care an ordinarily prudent

19

person in a like position would exercise under similar circumstances." *See* Minn. Stat. § 302A.361. As a result of Flynn's actions, TCI was unaware that a customer's debt was approximately $250,000 more than the amount shown on TCI's internal records. The undisputed facts establish that Flynn breached his fiduciary duty to TCI, thereby satisfying the first two elements of the claim.

Flynn contends that TCI is not entitled to damages because he did not profit from the breach. Flynn does not cite any authority for the proposition that a plaintiff who has been injured by a breach of a fiduciary duty cannot recover unless the defendant has benefited from the breach. We are unaware of any such caselaw. The evidence shows that TCI was injured by Flynn's breach of his fiduciary duty in the same manner that TCI was injured by Flynn's fraudulent misrepresentation: TCI settled with Five Star for an amount that is less than the amount Five Star actually owed to TCI and less than what TCI believed was owed. The issue yet to be determined is the extent to which TCI's settlement with Five Star was reduced because of Flynn's breach of his fiduciary duty. The amount of damages to which TCI is entitled is a genuine issue of material fact that must be determined by a factfinder at trial.

## D E C I S I O N

The district court did not err by denying TCI's motion for summary judgment and granting summary judgment in favor of Flynn on TCI's claims of conversion and civil theft. The district court also did not err by denying TCI's motion for summary judgment on its claims of fraudulent misrepresentation and breach of fiduciary duty. But the district court erred by granting summary judgment in favor of Flynn on TCI's claims of fraudulent

20

misrepresentation and breach of fiduciary duty. Therefore, we affirm in part, reverse in part, and remand to the district court for trial on the issue of damages on the claims of fraudulent misrepresentation and breach of fiduciary duty.

**Affirmed in part, reversed in part, and remanded.**

**REYES**, Judge (concurring in part, dissenting in part)

While I agree with sections I, III, and IV of the majority opinion, I respectfully dissent from its conclusion in section II regarding TCI's civil-theft claim. I would conclude that the district erred by denying TCI's motion for summary judgment on its civil-theft claim and entering summary judgment in favor of Flynn. The common usage of the word "steal" is "to take or appropriate without right or leave, and with the intent to keep *or make use of wrongfully*." *Merriam-Webster Dictionary* 1220 (11th ed. 2014) (emphasis added). Based on this common usage, the undisputed facts of this case establish that Flynn stole personal property from TCI and is liable for civil theft under Minn. Stat. § 604.14, subd. 1 (2016).

On appeal from summary judgment, we review the district court's decision de novo and view the evidence in a light most favorable to the party against whom summary judgment was granted. *Commerce Bank v. W. Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015). The district court found that the transfer of funds only occurred internally from one client account to another and that Flynn did not steal anything because he did not take possession of the property. As a result, the district court concluded that Flynn's conduct fell outside the scope of Minn. Stat. § 604.14, subd. 1.

Under section 604.14, subdivision 1, "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." In interpreting this statute, "courts rely on the criminal theft statute to determine whether a defendant's conduct amounted to [civil] theft." *Damon v. Groteboer*, 937 F. Supp. 2d

1048, 1076 (D. Minn. 2013) (citing *Popp Telcom, Inc. v. Am. Sharecom, Inc.*, No. Civ. 96–1177, 2003 WL 1610789, at *9 (D. Minn. Mar. 20, 2003), *aff'd*, 361 F.3d 482 (8th Cir. 2004)[3] (both cases interpreting the civil-theft statute, Minn. Stat. § 604.14, subd. 1, and *Damon* noting the limited caselaw authority examining that statute).[4] "The [criminal] statute was intended to reach cheats and swindlers of all kinds and descriptions." *State v. Wells*, 265 Minn. 212, 214, 121 N.W.2d 68, 69 (1963). Therefore, "[n]o single definition can cover the range of possibilities for the offense." *State v. Ruffin*, 280 Minn. 126, 130, 158 N.W.2d 202, 205 (1968). Further, there is "no requirement that the victim suffer any pecuniary loss whatsoever. Once the victim [parts] with her money in reliance on false representations, it [is] immaterial whether whatever she got in return was equal in value to that which she surrendered." *State v. Lone*, 361 N.W.2d 854, 859–60 (Minn. 1985).

As the majority notes, the operative word in the statute, "steals," is not defined in chapter 604. Therefore, we look to the term's plain and ordinary meaning and can refer to its common usage. *See, e.g.*, *Cocchiarella v. Driggs*, 884 N.W.2d 621, 629 (Minn. 2016) (Anderson, J., dissenting). As the majority further notes, citing *Webster's New*

---

[3] While not binding, federal court opinions are persuasive and should be afforded due deference, particularly where, as here, no Minnesota appellate court has addressed the issue. *See Citizens for a Balanced City v. Plymouth Congregational Church*, 672 N.W.2d 13, 20 (Minn. App. 2003) ("Although not binding, these other federal court opinions are persuasive and should be afforded due deference."); *see also State v. Eichers*, 840 N.W.2d 210, 216 (Minn. App. 2013) (looking to persuasive Eighth Circuit caselaw where no Minnesota appellate court squarely addressed issue), *aff'd on other grounds*, 853 N.W.2d 114 (Minn. Sept. 10, 2014).

[4] The majority takes issue with the use of the word "theft" when referring to Minn. Stat. § 604.14, subd. 1, the civil-theft statute at issue here, rather than the word "steal." "Theft" is defined as "the act of stealing." *Merriam-Webster Dictionary*, *supra*, at 1220.

*International Dictionary* 2465 (2d ed. 1946), "a leading dictionary defines the word 'steal' to mean '[t]o take, and carry away feloniously [or] to take or *appropriate without right or leave*, and with intent to keep *or make use of wrongfully; as, to steal money* or another's goods.'" (Emphasis added.) The majority also cites to *Merriam-Webster Dictionary*, *supra*, at 1220, which provides a similarly broad definition: "To take or *appropriate without right or leave* and with intent to keep *or make use of wrongfully*." (Emphasis added.) Black's Law Dictionary defines "steal" as "[t]o take (personal property) illegally with the intent to keep it unlawfully." *Black's Law Dictionary* 1548 (9th ed. 2009).

While one definition of "steal" is "to take . . . with intent to keep," this is not the only definition. Both above-cited lay dictionaries provide multiple definitions by using the disjunctive term "or," and define "steal" to include "appropriate without right or leave, and with intent to . . . make use of wrongfully." The *Webster's* definition goes further to include "as, to steal money." Because "[n]o single definition can cover the range of possibilities for the offense," *Ruffin*, 280 Minn. at 130, 158 N.W.2d at 205, "steal," includes appropriating money without right or leave with the intent to make use of it wrongfully. There is no requirement to find that the person "spends the money or invests it."

Based on the undisputed facts, Flynn appropriated money from TCI without right or leave with the intent to make use of it wrongfully. TCI's CEO directed Flynn to auction off Five Star's equipment to pay off the balance of $446,879.27 it owed TCI, and Flynn told him he was going to do so. He did not. Instead, Flynn admitted that he intentionally falsified documents in an elaborate series of false transactions "to make it appear that the auction had taken place." Without right or leave, he made use of the money wrongfully by

directing TCI's finance department to wire $250,378.40 of TCI's reserves to Company X. Flynn then contacted Company X the next day, told them that the TCI treasury department made a mistake, and asked them to send the same amount to TCI, with reference to Brian Flynn and Five Star. He did this so others at TCI would not be aware of this surreptitious transaction. Flynn told TCI that the funds were proceeds from the auction when in fact no auction occurred, and then applied the $250,378.40 to Five Star's account.

The undisputed facts show that Flynn appropriated $250,378.40 from TCI without right or leave, and admitted to acting with the intent to make use of that money wrongfully. As a result, Flynn's conduct falls within the scope of the civil-theft statute, and he is liable to TCI for the value of stolen personal property "plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." Minn. Stat. § 604.14, subd. 1. Therefore, the only remaining issue is the amount of damages, including punitive damages, which is a question for the factfinder on remand. Accordingly, I would reverse the district court's denial of TCI's summary-judgment motion and grant of summary judgment in favor of Flynn on the issue of civil theft, and I would remand for a determination of the amount of damages.